1      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
2              SPRINGFIELD DIVISION

3   Estate of AMON PAUL CARLOCK,    )
    JR., Deceased, by Mary L.       )
4   Andreatta-Carlock, Executor     )
                                    )
5            PLAINTIFF,             )    08-CV-03075
                                    )
6        VS.                        )
                                    )
7   NEIL WILLIAMSON, AS SHERIFF,    )    SPRINGFIELD, ILLINOIS
    OF SANGAMON COUNTY, ILLINOIC    )
8   et al.                          )
                                    )
9            DEFENDANTS,            )

10          TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SUE MYERSCOUGH
11             U.S. DISTRICT JUDGE

12   JULY 23, 2012

13   A P P E A R A N C E S:
     FOR THE PLAINTIFF:          MR. JON ROBINSON
14                               202 S. FRANKLIN
                                 DECATUR, ILLINOIS
15                               SHARON ELVIDGE KELLEY
                                 217 E. MONROE
16                               SPRINGFIELD, ILLINOIS
     FOR DEFENDANTS WILLIAMSON:  MR. ANDREW RAMAGE
17   DURR, BECKNER, FURLONG,      MR. JOHN MEHLICK
     POWELL, STRAYER:            400 S. NINTH STREET
18                               SPRINGFIELD, ILLINOIS
     FOR DEFENDANT GUY:          MR. RON STONE
19                               725 S. 4TH STREET
                                 SPRINGFIELD, ILLINOIS
20   FOR DEFENDANT MAURER:       MR. CHRISTIAN BISWELL
                                 107 E. ALLEN STREET
21                               SPRINGFIELD, ILLINOIS
     FOR DEFENDANT MAHER:        MR. CHRISTOPHER GALANOS
22                               400 S. NINTH STREET
                                 SPRINGFIELD, ILLINOIS
23
     COURT REPORTER:            KATHY J. SULLIVAN, CSR, RPR
24                              OFFICIAL COURT REPORTER
                                600 E. MONROE
25                              SPRINGFIELD, ILLINOIS
                                (217)492-4810

1                       I N D E X

2     WITNESS                                      PAGE
      RONALD BECKNER
3     Direct Examination by Mr. Mehlick              4
      Cross Examination by Mr. Robinson             12
4     Cross Examination by Mr. Stone                38
      Redirect Examination by Mr. Mehlick           40
5     Recross Examination by Mr. Robinson           40

6     TERRY DURR
      Direct Examination by Mr. Mehlick             42
7     Cross Examination by Mr. Robinson             47

8     WILLIAM STRAYER
      Direct Examination by Mr. Mehlick             64
9     Cross Examination by Mr. Robinson             72

10    TAMMY POWELL
      Direct Examination by Mr. Mehlick             84

11

12

13                    E X H I B I T S

14    GOVERNMENT'S EXHIBIT
      NUMBER                   IDENTIFIED   ADMITTED
15

16

17

18

19
      DEFENDANT'S EXHIBIT
20    NUMBER                   IDENTIFIED   ADMITTED

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        *    *    *    *    *    *    *    *    *    *    *

 3             THE COURT:  On the record, this is

 4     08-CV-03075, Carlock versus Sangamon County.  The

 5     plaintiff is represented by Jon Robinson, Sharon

 6     Elvidge Kelley.  The defendants by Andrew Ramage,

 7     John Mehlick, Ron Stone, Chris Biswell and --

 8             MR. GALANOS:  Chris Galanos, Your Honor.

 9             THE COURT:  And could you spell it for me

10     again.

11             MR. GALANOS:  Certainly.  G-a-l-a-n-o-s.

12             THE COURT:  Thank you.  Galanos, okay.

13        Cause is called for hearing on plaintiff's

14     second renewed motion for sanctions and motion for

15     appointment of a special master.

16        As I understand it, today we're going to have

17     some testimony of defendants who have completed

18     affidavits.  Will there be Beckner, Kane, Durr,

19     Furlong, Guy, Powell, Sacco, Strayer, and

20     Williamson, or...

21             MR. MEHLICK:  Just five.

22             THE COURT:  Five, okay.

23        All right.  Mr. Mehlick, will you be calling

24     your witnesses?

25             MR. MEHLICK:  Yes.
```

1          THE COURT:  Okay.  Please call your first

2   witness.

3          MR. MEHLICK:  Before, Your Honor, I'm going

4   low tech.  And I -- the only exhibits I have, three

5   of them have already been admitted, I believe, and

6   marked.  I have a courtesy copy for the Court, and a

7   copy of the one I am going to introduce and -- for

8   everyone, so we don't have to keep digging around

9   for the ones that have already been there.

10          THE COURT:  Thank you for the courtesy.

11      And I apologize for running late.  We were

12   trying to call up a CD on our large screen and had

13   some technical difficulties.  As you could see, we

14   had to call the master.

15          MR. MEHLICK:  Okay.  The County would call

16   Ron Beckner.

17          THE CLERK:  If you would step in front of

18   me, please.

19      (The witness was sworn.)

20                  RONALD BECKNER

21   called as a witness herein, having been duly sworn,

22   was examined and testified as follows:

23               DIRECT EXAMINATION

24   BY MR. MEHLICK:

25      Q.  Would you state your name, please?

1     A.   Ronald L. Beckner.

2     Q.   How do you spell your last name?

3     A.   B-e-c-k-n-e-r.

4     Q.   And what is your present occupation?

5     A.   I'm retired from Sangamon County Sheriff's

6     Office.

7     Q.   And what was your position at the Sangamon

8     County Jail before you retired?

9     A.   I was the administrative assistant

10    lieutenant.

11    Q.   And back in October, November of 2007, what

12    was your position?

13    A.   Administrative assistant lieutenant at the

14    jail.

15    Q.   How long have you -- did you work for the

16    Sangamon County Sheriff's Department and the

17    Sangamon County Jail?

18    A.   28 years.

19    Q.   And when did you retire?

20    A.   January 30th, 2010.

21    Q.   I'm going to hand you what's previously been

22    marked Plaintiff's Exhibit D for identification.

23    And I'm going to refer you to a particular exhibit

24    included in that group exhibit.  And could you tell

25    us what that is?

1       A.   This is an affidavit.  Affidavit that I

2    signed.

3       Q.   And when did you sign that affidavit?

4       A.   March 11th, 2011.

5       Q.   I'm going to direct your attention to

6    Paragraph 17 of that affidavit.  In that paragraph

7    you use the term "regarding this case."  Could you

8    tell the Court what you meant when you used that

9    term?

10      A.   I assumed I mean the day of his death.  Or

11   any e-mails thereafter.

12      Q.   What do you mean by that day?  The day of

13   his death --

14      A.   The incidents that actually happened on

15   November --

16      Q.   16th?

17      A.   16th, and any e-mails thereafter.

18      Q.   Okay.  And now I'm going to show you what's

19   been previously marked Plaintiff's Exhibit B and ask

20   you if you recognize that?

21      A.   Yes, I do.

22      Q.   And what is that?

23      A.   I had a procedural problem that needed to be

24   corrected and I sent a memo to the third shirt via

25   e-mail concerning the procedural problem.

1      Q.  Okay.  It's an e-mail?

2      A.  Yes, sir.

3      Q.  And is it -- who's the e-mail from?  Who

4  sent the e-mail?

5      A.  I sent -- or I sent it.

6      Q.  And who did you send that e-mail to?

7      A.  The shift commanders and supervisors of

8  third shift, with a carbon copy to my superiors,

9  Superintendent Durr and Assistant Superintendent

10  Strayer.

11      Q.  Okay.  You refer to DARs in that e-mail.

12  What's a DAR?

13      A.  That's a daily activity report.  It's a

14  report that each shift commander fills out at the

15  beginning of the shift.  It's suppose to have

16  information that's pertinent to be passed on to the

17  officers.  And then throughout the shift, as

18  incidents or problems occur, or information becomes

19  available, they enter that into the daily activity

20  report.  And pass it on to the next shift.

21      Q.  Is there a daily activity report for each

22  shift every day?

23      A.  There is.

24      Q.  So there's three daily activity reports a

25  day?

1        A.   That's correct.

2        Q.   And your e-mail was addressed to the third

3   shirt commanders; is that correct?

4        A.   That's correct.

5        Q.   And what were you addressing in this e-mail

6   with regard to Mr. Carlock?

7        A.   There was an omission in third shift's daily

8   activity report that had been passed on by second

9   shift.  And I was directing their attention to that

10  to get it corrected.

11       Q.   Which -- do you consider this e-mail

12  regarding this case?

13       A.   No.

14       Q.   Why not?

15       A.   This is a procedural problem that I was

16  trying to address.  It had nothing to do with the

17  case involving Mr. Carlock.

18       Q.   I'm going to hand you now what's been marked

19  Defendant's Exhibit 28 for identification and ask if

20  you can identify those.  It's a group exhibit.

21       A.   Okay.  These are all daily activity reports

22  from the second shift on October the 16th, 2007,

23  until the first shift October the 17th, 2007.

24       Q.   The second page of that is the third shift

25  from October the 16th; is that correct?

1      A.   That is correct.

2      Q.   And does that include anything about

3  Mr. Carlock and prior law enforcement training?

4      A.   It does not.

5      Q.   And is that why you sent this e-mail?

6      A.   That's precisely the reason I sent the

7  e-mail.

8      Q.   In the next three DARs, including the third

9  shift the next day, does it then include information

10  about Mr. Carlock and that he has prior law

11  enforcement training?

12      A.   They all do after my memo.

13      Q.   So your e-mail worked?

14      A.   That was the purpose.

15      Q.   Did you recall this e-mail at all when you

16  signed your affidavit?

17      A.   No, I did not.

18      Q.   If you were given that e-mail prior to your

19  signing your affidavit, would you have still signed

20  your affidavit saying that you had no e-mails

21  regarding this case?

22      A.   Correct.  I would have.

23      Q.   Who -- did correctional officers have access

24  to any e-mail at the jail?  Then or now?

25      A.   I don't know about now, but at that time

1    they did not.

2        Q.  Okay.  Only the shift commanders or command

3    staff had access to computers at the jail that would

4    send or received e-mails?

5        A.  It was the shift commanders, the

6    administrative staff, and certain special areas that

7    did.  For instance, the court office and the

8    classification office.

9        Q.  With regard to things that are happening

10   with inmates on a shift, did you communicate that by

11   e-mails or by the daily activity reports?

12       A.  That happened through daily activity

13   reports.

14       Q.  Did you ever do it by e-mail?

15       A.  Just for procedural problems such as this.

16       Q.  But not -- well, for example, the exhibit

17   you're holding, Defendant's 28.  If the Court were

18   to look at that they would note what, that there's a

19   number of things about incidents or things involving

20   inmates; is that correct; during that particular

21   shift?

22       A.  That's correct.

23       Q.  For example, if you look at that, is

24   there -- on every one of those are there mentions of

25   Mr. Carlock, about eating, not eating, going to

1   court, things like that on there?

2       A.   Yes, there is.

3       Q.   They're documented in there?

4       A.   There is.

5       Q.   And those reports, those daily activity

6   reports, are kept.  Are preserved.  Is that correct?

7       A.   Yeah.

8       Q.   Okay.  They are -- none of them have been

9   destroyed?

10      A.   Not to my knowledge, no, sir.  Not suppose

11  to.

12      Q.   As you sit there today, do you recall any

13  other e-mails that you either sent or received that

14  had nothing to do with -- of course your attorneys,

15  e-mails regarding to or from your attorneys; that

16  even had the word Carlock in it as you sit here

17  today?

18      A.   Not that I can recall, no, sir.

19          MR. MEHLICK:  I have no further questions.

20          THE COURT:  Thank you.  How do you wish to

21  proceed?  Mr. Robinson and then Mr. Stone,

22  Mr. Biswell.  Is that --

23          MR. STONE:  That's fine, Your Honor.

24          THE COURT:  All right.  Mr. Robinson.

25          MR. ROBINSON:  Thank you.  If it's all

1    right with Your Honor, I think I'll just stay here

2    with my papers.

3               THE COURT:  Mm-hmm.

4                     CROSS EXAMINATION

5    BY MR. ROBINSON:

6        Q.  Mr. Beckner, were you aware when you signed

7    the affidavit that it was going to be submitted to

8    the federal court?  To this Court?

9        A.  Yes, sir.

10       Q.  Did you prepare the affidavit or did someone

11   else?

12       A.  Well, the attorneys prepared the affidavit

13   for me.

14       Q.  Did they explain to you why they were having

15   you include the paragraph you referred to,

16   specifically paragraph 17, stating, "I did not send

17   or receive any e-mails regarding this case except

18   for e-mails from my attorney, which are privileged."

19       A.  Yes, sir.

20       Q.  Did they explain that to you?

21       A.  They did.

22       Q.  Now, I take it that as -- since you're in

23   law enforcement, you understand that it's very

24   important to be precise and to be truthful when

25   you're making statements to the Court and to parties

1    that are in litigation?

2         A.  Yes, sir.

3         Q.  You signed this affidavit about three and a

4    half years after Mr. Carlock died in the Sangamon

5    County Jail, didn't you?

6         A.  That's correct.

7         Q.  And you're claiming at the time,

8    categorically, that you didn't send or receive any

9    e-mails regarding Mr. Carlock or this case.  Is that

10   true?

11        A.  This case, yes, sir.

12        Q.  And we've now found that there was an

13   e-mail, at least one e-mail, that was -- that you've

14   testified to that was presented to you by

15   Mr. Mehlick; isn't that true?

16        A.  That's true.

17        Q.  Do you know, can you sit here and

18   categorically tell this Court and us that there are

19   not and were not others that have been deleted?

20        A.  Deleted?  I didn't delete anything.  I don't

21   know of any others that concerned Mr. Carlock.

22        Q.  Can you state categorically, Mr. Beckner,

23   that you know that there never were any others that

24   you sent or received regarding Mr. Carlock?

25        A.  I can't say that for sure, no, sir.

1      Q.  Did you -- you in fact know that most if not

2  almost all of the e-mails from this time period in

3  2007, and in fact, all the way up until 2009, when

4  the computers were replaced, have been deleted?

5  Don't you know that?

6      A.  No, sir.  I did not know that.

7      Q.  Have you not had any discussions like that

8  with anyone prior to this hearing today?

9      A.  Not that I can recall, no, sir.

10     Q.  So it's your testimony under oath here today

11  that you didn't know that the -- that the County

12  and/or the Sheriff's Department had a deletion

13  policy for e-mails?

14     A.  A deletion policy?

15     Q.  Let me be more specific.

16     A.  Please.

17     Q.  Are you testifying that you had no knowledge

18  that your e-mails were not being saved, or that --

19  to put it another way, that they were being deleted

20  after 180 days?

21     A.  If you're talking about the falloff on

22  the -- I'm aware of that, yes.  I didn't know that

23  was a deletion, though.

24     Q.  You call it a falloff.  What do you mean by

25  the term falloff?

1　　　A.　Well, like you said, after 180 days.　Not

2　all of them were deleted, just ones for the 180th

3　day; is that correct?

4　　　Q.　Right.

5　　　A.　Okay.

6　　　Q.　You knew about that?

7　　　A.　I'm knew about that, yes.

8　　　Q.　Did you know about that when you signed your

9　affidavit?

10　　　A.　I'm sure I did.

11　　　Q.　And when you signed your affidavit, were you

12　still employed actively by the County and the

13　Sheriff's Department?

14　　　A.　That was in 2011; is that correct?

15　　　Q.　Well, your affidavit has a date.　It's

16　March 11th, 2011.　Were you still employed then?

17　　　A.　No, sir.　I was retired.

18　　　Q.　Okay.　You were a party to this case though,

19　you were aware of that, at the time?

20　　　A.　I'm sorry, repeat?

21　　　Q.　Were you a party -- you knew that you were a

22　party to this case?

23　　　A.　Oh, yes.

24　　　Q.　Okay.　Did you know at the time that you

25　signed this affidavit in March of 2011, that the

1   defendants, which of course would include you, were

2   claiming that there were no relevant e-mails

3   regarding the Carlock matter?

4       A.  Yes, sir.

5       Q.  Okay.  And you knew, therefore, that this

6   affidavit would be helpful or could be helpful to

7   that defense?  Correct?

8       A.  Of course, yes.

9       Q.  Okay.  And I ask you again, if e-mails were

10  deleted because of what you call the falloff, what I

11  call the 180-day deletion policy, you have no way of

12  knowing that there weren't any number of other

13  e-mails that you sent or received regarding the

14  Carlock matter?

15      A.  That's true.

16      Q.  Would you agree with me that the e-mail --

17  that the affidavit which has been, marked and which

18  you've testified to, that is the March 11, 2011,

19  affidavit that you signed, is not correct and not

20  accurate?

21      A.  No, sir, I wouldn't agree to that.  Because

22  the e-mail that you found had nothing to do with

23  this case.

24      Q.  So that's your judgment?  That the Court

25  should accept your judgment that it has nothing to

1    do with this case?

2        A.  It was a procedural memo addressing a

3    procedure.  The case would have happened in

4    November, this was before that.  And this was just

5    dealing with procedure.  It wasn't dealing with

6    Mr. Carlock in particular.

7        Q.  Have you read the complaint in this case to

8    know that it dealt with both October and November,

9    during which time Mr. Carlock stayed in the jail

10   prior to the date of his death?

11       A.  Once again, this particular memo that you're

12   referring to had nothing to do with the case period.

13   It was a procedural memo that I sent out to correct

14   a problem.

15       Q.  It mentions Mr. Carlock and it dealt with

16   Mr. Carlock, did it not?

17       A.  It did.

18       Q.  And if Mr.  -- if everything that happened

19   in the jail in October, November of 2007 would be

20   relevant to this case, including audio and video

21   recordings, you still say that in your opinion, in

22   your judgment, it wouldn't be relevant?

23       A.  In my opinion, yes, sir, it would not be

24   relevant.

25       Q.  You also made a statement in your affidavit

1   about the video.  Do you recall that?

2       A.  Not offhand, no.

3       Q.  Well, do you have your affidavit in front of

4   me?

5       A.  No, sir, I still got the DARs.

6           MR. MEHLICK:  Your Honor, I'm going to

7   object.  That's outside the scope of direct.  And I

8   thought this was -- the whole purpose of this

9   exercise today, this testimony at this evidentiary

10  hearing, was regarding the affidavits with regard to

11  the e-mail, which is what we've been talking about

12  consistently and what was argued in the -- with

13  regard to his affidavit, the only thing, the only

14  issue that they brought up was the fact about the

15  e-mails.  And this one e-mail.  They didn't say that

16  he made any statements or anything different about

17  his -- about the videos.

18          THE COURT:  Well, I certainly am aware that

19  you limited your direct very specifically to what

20  you thought was the issue.

21      Where are we going with this, Mr. Robinson?

22          MR. ROBINSON:  Well, Your Honor, two

23  responses.  Number one, the hearings today are about

24  whether or not the -- Mr. Beckner's and the others

25  are false affidavits.

1       Number two, video that's stored digitally is
2   stored on computers and it is electronically stored
3   information, it's ESI, and that's what we are
4   talking about.
5       So, I think the -- the primary answer or
6   response is this is question of whether or not
7   Mr. Beckner submitted to this Court and to us false
8   affidavits, whether it has to do with ESI that was
9   stored video or whether it has to do with e-mails.
10      I will agree that when we were in here before,
11  we were talking specifically about ESI and e-mails.
12  However, we were talking specifically about
13  Mr. Beckner's and the others' affidavits.
14          THE COURT:  Well, I agree with you, but
15  this is the first I've heard you raise an issue
16  about the VHS tape.  I didn't realize that there was
17  a claim of spoliation as to the tape, also.
18          MR. ROBINSON:  Well, Your Honor, there's
19  been -- there have been hearings and there have been
20  pleadings filed about spoliation of audio tapes,
21  which don't happen to involve Mr. Beckner.  But the
22  video, which does, because as he has testified in
23  his deposition, and others have said, when he was
24  working actively in the jail he was in charge of the
25  video and the preservation of it.  And he has

1    presented affidavits and testimony in deposition.

2        So that's clearly a significant part of this.

3    Just -- ESI, e-mails are only a third of the

4    spoliation claim.

5            THE COURT:  Mr. Mehlick.

6            MR. MEHLICK:  Those issues were addressed,

7    Your Honor, previously.  And this present motion

8    before the Court did not raise any issues as to his

9    affidavit with regard to truthful or not with regard

10   to any issue except these people with regard to

11   their e-mails, not anything else they said in their

12   affidavits.  That's why we're here today.

13       Any other -- we start allowing questions, we're

14   having another deposition of Mr. Beckner three years

15   after he had his deposition.  I mean I don't see any

16   purpose that that would help the Court to make a

17   determination as to what they've raised in their

18   motion.

19           THE COURT:  Well, to be honest, Mr.

20   Robinson, I was surprised that there was no

21   allegation about the VHS tape as it pertained to the

22   affidavit.  I assume you've asked these questions in

23   depositions?

24           MR. ROBINSON:  No, we have -- Your Honor,

25   we have filed previous pleadings where we have

1    spoken repeatedly about audio and video.

2            THE COURT:  Correct.

3            MR. ROBINSON:  And this is the first

4    opportunity after the deposition that we've had to

5    inquire of Mr. Beckner, frankly, about any of that.

6            THE COURT:  Well, let me ask, Mr. Mehlick,

7    are you willing to make Mr. Beckner available for

8    further deposition for this purpose?

9            MR. STONE:  Judge, may I speak?

10            THE COURT:  Yes, you may.

11            MR. STONE:  I'm not sure that anybody has

12    the full deposition here at this point.

13            MR. RAMAGE:  I do.

14            MR. STONE:  I suppose the question would

15    hinge on whether he had the opportunity to ask those

16    questions of him earlier.

17            MR. MEHLICK:  Your Honor, this gentleman

18    was presented for deposition.  He was asked anything

19    he wanted.  If he chose -- I think he did ask some

20    questions about the videos.  I'm not -- I'd have to

21    check the deposition again.

22        But what I'm getting at is, because he chose

23    not to ask at that time, why does he have a right to

24    ask him now?  I mean -- and if he didn't, where do

25    you draw the line here and say discovery is over.

1    We've filed motions for summary judgment in this

2    case and he's asking for more discovery?

3              MR. ROBINSON:  When I took Mr. Beckner's

4    deposition, it was several years ago, and it was a

5    long time before he chose to file a false affidavit.

6    And that falsity deals not only with the e-mails

7    that have disappeared, but also with video that

8    mysteriously didn't get either preserved or it was

9    destroyed.  And Mr. Beckner was truthfully

10   identified as the person who dealt with that.

11       I didn't know a thing about his false affidavit

12   two years before he signed it and filed it with this

13   Court.  I couldn't have.

14             THE COURT:  All right, Mr. Robinson.

15       Mr. Mehlick.

16             MR. MEHLICK:  We've got his deposition

17   here.  Starting oh Page 48 he's asked him about the

18   cameras and the videos.  Now, whether or not he

19   asked the questions he wanted to or wished he would

20   have, I don't know.  But he did ask him questions.

21   He was -- he knew that he had -- he did things with

22   the videos, took care of them, preserved them.  He

23   was asked about them in his deposition.  I'm just

24   saying we need to draw a line somewhere.

25             THE COURT:  Well, Mr. Mehlick, I agree with

1    you that we do need to draw a line somewhere, but

2    I'll allow limited questions at this time.  Mr.

3    Robinson, if we can be --

4            MR. ROBINSON:  Thank you.

5    BY MR. ROBINSON:

6        Q.  Do you have a copy of your affidavit there

7    in front of you?

8        A.  No.  I still have the daily activity

9    reports.

10       Q.  Would you refer to Paragraph 6 and 7 at the

11   top of Page 2 of your affidavit, please.  You can

12   read those to yourself, if you wish.

13       A.  Okay.

14       Q.  Have you read those?

15       A.  Yes.

16       Q.  You state here that on November 16th, you

17   went to a room in the jail to search for video

18   recordings.  You see that, Paragraph 6?

19       A.  Yes.

20       Q.  And in Paragraph 7 you said that the camera,

21   the first DVR that you searched was camera 38?

22       A.  Correct.

23       Q.  And is that the one that ultimately was

24   provided to the plaintiffs, if you know?

25       A.  Yes.

1      Q.   That's the only one that was provided, if

2  you know?

3      A.   That I know of, yes.

4      Q.   Now, the DVR from that camera did not show

5  the incident involving Mr. Carlock in the hallway

6  outside his cell, did it?

7      A.   Only partially.

8      Q.   What part did it show of Mr. Carlock?

9      A.   Oh, wow.  It just showed -- you could just

10  barely make out a scuffle there in the corner.  You

11  couldn't make out too much.

12      Q.   Other than having the time precise to the

13  second when certain identified people would walk

14  into that hallway that were jailers and such, it

15  didn't show anything of Mr. Carlock, did it?

16      A.   His feet.  If I remember right.

17      Q.   You were a witness on that day to what

18  happened, at least in part, in the jail?

19      A.   Yes.

20      Q.   You testified that it showed the scuffle --

21  a scuffle with Mr. Carlock, but it didn't show

22  anything like that, did it?

23      A.   What I did see was Mr. Furlong getting

24  thrown backwards when he was trying to subdue

25  Mr. Carlock.  It did show that.

1    Q.  Well, unfortunately I don't have the video

2    here or the time to show you now, but are you quite

3    certain of that?  And willing to testify under oath

4    here today, as you are, that that's --

5    A.  Sir, it's been over two and a half years

6    since I've been retired, it's been five years since

7    the incident.  I don't recall anything real clear at

8    the present time.

9    Q.  That's precisely my point earlier when I

10    asked you about how you could categorically deny

11    sending or receiving any e-mails about Mr. Carlock

12    in an affidavit that could be perjury if it's not

13    true.  Did you think about that before you signed

14    the affidavit?

15    A.  First of all, I didn't remember the memo

16    that you're talking about.  And again, if I had seen

17    it, I still don't think it's pertinent to the case.

18    It was a procedural problem.

19    Q.  Did somebody tell you that it was your

20    judgment call as to what was related to this case

21    and what wasn't?

22    MR. STONE:  Judge, we're getting

23    argumentative.  There's no jury here.  If this has

24    something to do with what's contained in the

25    affidavit, I believe, I would suggest that it would

1    be more relevant if Mr. Robinson would pursue how it

2    was perhaps inconsistent with answers that

3    Mr. Beckner gave earlier in his deposition.  But

4    we're going far afield.

5            THE COURT:  The objection is overruled.

6    You may answer, Lieutenant Beckner.

7        A.  Repeat the question, please.

8        Q.  Could the --

9            THE COURT:  Kathy, could you read it back.

10    (Whereupon the requested material was read.)

11        A.  No, sir, they did not.

12        Q.  Did you know -- were you in Court when your

13    affidavit and the others were used as the basis for

14    an argument against sanctions in this case?

15        A.  I don't remember doing that, no.

16        Q.  It was in April of 2011.

17        A.  Sir, I don't recall it.

18        Q.  Did you -- you had testified, I think,

19    either in an affidavit or in your deposition, that

20    you searched for videos of Mr. Carlock in the jail.

21    Do you recall that?

22        A.  Yes, sir, I do.

23        Q.  And do you recall stating either in your

24    deposition or in an affidavit or in answers to

25    interrogatories that you decided on your own that

1    there wasn't anything relevant on the videos

2    regarding Mr. Carlock, so you didn't save them?

3        A.  I did not find anything on Mr. Carlock in

4    the videos.

5        Q.  Did you look?

6        A.  Yes, sir, I did.  I wish I would have found

7    something.

8        Q.  If your -- if your testimony in an affidavit

9    or interrogatory answers is to the effect that you

10   didn't look because you didn't think there would be

11   anything involving Mr. Carlock to see; which is

12   true, that statement or your claim now?

13           MR. MEHLICK:  Your Honor, I'm going to

14   object to this line of questioning.  General

15   questions that he may have said this or that.  If he

16   shows him an answer from a deposition or an

17   affidavit or something, yes, he can say yes, no, he

18   remembers.  But just a general statement of that,

19   Your Honor, he can make up anything he wants and say

20   do you think about that now.

21           THE COURT:  The objection is overruled.

22       A.  Okay.  What is the question again?

23       Q.  What would be more accurate, your prior

24   statement if you said you really didn't look because

25   you didn't think it was important, or your statement

1    now that you did look and didn't find anything?

2           MR. MEHLICK:  I object to the

3    characterization of that question, Your Honor.

4           THE COURT:  The objection is overruled.

5       A.  Okay.  First of all, I did look.  I looked

6    in the booking area.  I did not search every camera

7    in the jail, that's correct, because I just --

8       Q.  I'm only asking you, Mr. Beckner, about the

9    cameras that you mention in your affidavit, which

10   are numbers 35, 45, 36, 37, and 35.

11      A.  I don't remember what those numbers mean.  I

12   assume those are all the ones down in the booking

13   area?

14      Q.  Yes.

15      A.  Okay.  You couldn't see anything.

16      Q.  You claim you searched them all though?

17      A.  I did, sir.

18      Q.  Now, what would have been required -- well,

19   let me withdraw that.

20      Were you -- were you the person in the jail

21   administration who was in charge of keeping any

22   recordings, basically preserving any recordings of

23   incidents and events in the jail?

24      A.  On the ones that were saved, yes.  I mean,

25   there was 64 cameras that were constantly being

1    videotaped.

2        Q.  Sir, my question is very simply.  It's just

3    were you the person, one of the two people that were

4    designated in the jail to make sure that any

5    important video was preserved?

6        A.  Yes.

7        Q.  Who was the other person.

8        A.  I believe it was Lieutenant Brents.

9        Q.  Now, would you explain to us for the record

10   what would have been necessary for you to have

11   preserved video in the hallways from November 16th,

12   2007, through the time when Mr. Carlock left the

13   booking area on the gurney with the EMTs?

14       A.  I'd have had to go back to the room, search

15   for it, put it on video -- or put it on disk and

16   mark it.

17       Q.  How difficult would that have been?

18       A.  The search would have been the difficult

19   part.  The taping of it, the preserving of it, is

20   not that difficult.

21       Q.  Well, what we're talking about, sir, would

22   be the video in the booking area from the time that

23   the jail started moving around on November 16th, and

24   people like Mr. Carlock was taken to the medical

25   department that morning and he went through the

1  hallways, so we could see what his condition was

2  like.

3         How difficult would it have been to go back

4  three hours, for example, from 6:00 a.m., to let's

5  say 9:00 a.m., on November 16, especially if you did

6  as you claim you did, you searched that very day?

7         A.  Well, it wouldn't have been difficult at

8  all.

9         Q.  Why didn't you do that?

10        A.  You're asking question for -- first of all,

11  I wasn't aware that he had went to the medical unit.

12  I thought everything had happened down there in the

13  cell.  So I didn't even think about searching for

14  the hallway.  I had no idea he went to the medical

15  unit.  Until now.

16        Q.  Did you not keep track, as a jail

17  administrator, of the special people that were in

18  the high risk area, as to what their medical

19  conditions, diabetic, go to the medical unit?

20        A.  No, sir.  I did not keep track of that.

21        Q.  Okay, okay.  Fair enough.

22        But it wouldn't have been difficult for you to

23  have preserved all of the video from the booking

24  area, including the hallways that morning, wouldn't

25  it?

1        A.   No, it would not have been difficult at all.

2        Q.   The -- you had previously circulated several

3    written policies about video of special incidents in

4    the jail.  Do you recall those?

5        A.   Yes.  Some of them.

6        Q.   And one of them dealt with videotaping

7    because it was important to preserve exactly what

8    happened.  Do you recall that?

9             MR. MEHLICK:  Your Honor, without showing

10   him, I'm going to object.  Because there was a video

11   that was -- I mean a memo that turned out to having

12   to do with the video camera systems that were in

13   affect at the time of the incident when Mr. Carlock

14   was in there.  It was several years prior to the

15   installation of these cameras.  So it was about

16   procedures way before Mr. Carlock was even in the

17   jail.  And how they were handling videotaping of

18   incidents at that time.

19             THE COURT:  Mr. Robinson, can you show that

20   to Lieutenant Beckner?

21             MR. ROBINSON:  Pardon me?

22             THE COURT:  Can you show what you're

23   talking about to the witness?

24             MR. ROBINSON:  Yes, I can.

25             MR. MEHLICK:  This was raised earlier, Your

1    Honor.  It had to do with handheld videos that were

2    used.  It had nothing to do with this.

3              MR. ROBINSON:  May I approach?

4              THE COURT:  You may.

5    BY MR. ROBINSON:

6        Q.  I will hand you; and I haven't marked these,

7    but these are in the discovery; four memos.  I will

8    represent at least for now, until you look at them,

9    that they are from you, signed, at least in type, by

10   you.

11       The first one is dated February 22nd, 2002.

12   Subject, video monitoring system.  Second one is

13   dated February 26th, 2002, only four days later,

14   regarding video recording capability.  The third one

15   is dated February 25, 2004, subject is video camera

16   procedures revised.  And finally, one dated July 13,

17   2007, which is only a -- just a couple of months or

18   so before Mr. Carlock's death.  That one the subject

19   is documentation.

20       I want to hand these to you, sir, and give you

21   time to take a look at those and familiarize

22   yourself.

23       A.  Okay, sir.

24       Q.  All right.  Is it --  without reading those,

25   I'm just going to ask you generally, is it true that

1    those are four memos regarding video in the jail?

2        A.   The first three are.   This last one...

3        Q.   Is the last one dated in July of 2007, does

4    it have to do with documentation --

5        A.   Documentation.

6        Q.   -- and use of video?

7        A.   It doesn't say anything about videos that I

8    can see.   Of course I read through pretty quick.

9        I don't see anything about video in the last.

10       Q.   Is video a handy tool to unequivocally show

11   what happened inside the jail --

12       A.   It sure is.   That's why I wish we had more

13   in this case.

14       Q.   Okay.   And there was a camera that shot

15   down, that could have taken the picture of the

16   hallway and could have shown everything that

17   happened to Mr. Carlock on the morning of

18   November 16, 2007; isn't that true?

19       A.   That's true.

20       Q.   And that wasn't turned on by the control

21   room or anybody there; is that correct?

22       A.   That's correct.   I sure wish it was.

23       Q.   And you were there at the time while that

24   was going on, were you not?

25       A.   Yes.

1    Q.  And you know that whole event lasted, well,

2    upwards of a half an hour total; isn't that true?

3    A.  That's about right.

4    Q.  And was that -- did that give you, or anyone

5    else who was knowledgeable about video, an

6    opportunity to turn it on?

7    A.  To be honest with you, I didn't think about

8    it.  At the time I was busy concentrating on the

9    event.  And I'm sorry it wasn't turned on, because

10   it would have shown what we needed to see.

11   Q.  And you had previously emphasized in these

12   memos, the four that you have there, or at least

13   three of the four that dealt with video recordings,

14   how important it was to use the video in the jail;

15   isn't that true?

16   A.  Yes.  Some of these though -- one of these

17   was based on the handheld videos.  But all of them

18   are important.

19   Q.  But the same principle applies whether it's

20   handheld or one that's turned on looking down the

21   hallway right at Mr. Carlock in front of cell 16?

22   A.  Yes, sir.  They are --

23   Q.  Same principal --

24   A.  -- all important.

25   COURT REPORTER:  One at a time, please.

1    Q.  You could have turned it on, but it wasn't?

2    A.  Yes.

3    Q.  Okay.  Now, given the fact that as you have

4    testified earlier, that your memory isn't perfect,

5    and wasn't perfect in March of 2011, when you signed

6    the affidavit, why is it that you categorically

7    denied sending or receiving any e-mails relevant to

8    this?

9    A.  Again, all I can say is, I didn't realize

10   that that memo existed.  It was in a procedures

11   file.

12   Q.  Did somebody encourage you to sign the

13   affidavit that way and include that statement?

14   A.  No, sir, they did not.

15   Q.  But yet you knew why it was being signed and

16   you knew what was going to be argued regarding that,

17   didn't you?

18        MR. MEHLICK:  It's been asked and answered

19   about three times, Your Honor.

20        THE COURT:  The objection is overruled.

21   You may answer.

22   A.  I knew that.  But again, I didn't realize it

23   was there.  And still, it's a procedural memo.

24   Q.  How do we know, as I said before, that there

25   aren't many others, given the fact that the County

1   deleted most of the e-mails?

2       A.  I can't guarantees that there are no more

3   e-mails.  I can sit here and tell you I don't

4   remember sending any.

5       Q.  Did you, when you signed this affidavit, did

6   anybody explain to you that it was important that it

7   be accurate because it was made under penalties of

8   perjury?

9       A.  As I said before, yes.

10      Q.  Did you realize when you signed the

11  affidavit that you had to make a reasonable and

12  intelligent inspection, or at least do some due

13  diligent searching, to make sure that what you were

14  stating was true?

15      A.  Yes.

16      Q.  Did you know that you could have said upon

17  information, belief, or I think so or maybe or what

18  have you, but you didn't?

19      A.  That's correct, I didn't.

20      Q.  One or two last questions, Mr. Beckner.

21      Are you quite sure that you searched for video

22  of Mr. Carlock on November 16, 2007?

23      A.  Yes, sir, I am sure.

24      Q.  So if the records show that you didn't

25  preserve the video until December the 3rd, some days

1    later, how do you explain that?

2        A.  I can not explain that.  I don't remember

3    why.

4        Q.  One last question that I'm curious about,

5    sir.  And that is, you've known for several weeks

6    that there was an issue about whether your affidavit

7    was true or not, isn't that true?  Isn't that

8    correct?

9        A.  No, that's not correct.  I didn't know that.

10       Q.  Well, why did --

11       A.  I knew there was a question on the videos,

12   that's all -- or on the e-mails.

13       Q.  Well, that's what I'm asking you about.  You

14   knew that there was some issue about whether your

15   affidavit was truthful about sending or receiving

16   e-mails, and you knew that for several weeks?

17       A.  Well, two.  Yes.

18       Q.  Can you explain why you haven't come forward

19   to this Court and withdrawn or corrected your

20   affidavit before now?

21       A.  No, I can't.

22           MR. ROBINSON:  No further questions.

23           THE COURT:  Mr. Stone.

24

25

CROSS EXAMINATION

BY MR. STONE:

Q.  Mr. Beckner, at the time of the incident did you hold the position of lieutenant?

A.  Yes.

Q.  And were you also the assistant supervisor of the jail itself?

A.  Administrative assistant.

Q.  Yes.  And again, the purpose of the DARs, is that to inform the oncoming supervisors of significant issues that they should be aware of?

A.  Yes, sir.

Q.  And so that there's sort of a seamless transformation of information from one shift to the next on events that are of significance?

A.  That's correct.

Q.  And what's the significance of the fact that Mr. Carlock was a prior police officer?

A.  He had knowledge of tactics and the officers needed to be aware of that.  He had knowledge of police tactics and the procedures that they would use.

Q.  And that's a fairly well-established rule in the jail itself?  Because if they know the tactics that are going to be used --

1      A.  Yes.  They can take precautions.

2      Q.  Now, was the purpose of your writing this

3  e-mail to make the DAR more accurate for the

4  oncoming shift?

5      A.  It is.  It was.

6      Q.  And was the purpose of that so that the jail

7  runs better?

8      A.  Correct.

9      Q.  And if you had not included that correction

10  in your e-mail, would the only result have been that

11  the oncoming shift would not be aware of

12  Mr. Carlock's police officer status?

13      A.  That's correct.

14      Q.  And that's something that the correctional

15  officers should be aware of?

16      A.  Of course.

17      Q.  Do you monitor those DARs every day to make

18  sure in your mind; or did you use to; to make sure

19  in your mind that there was a conveyance of the

20  appropriate information from shift to shift?

21      A.  Yes, sir, I did.

22      Q.  So how many of these would you have done in

23  your career?

24      A.  A number of them.  I couldn't begin to

25  guess.

1          MR. STONE:  Okay.  That's all I have, Your

2     Honor.

3          THE COURT:  Mr. Biswell?

4          MR. BISWELL:  No questions.

5          THE COURT:  Mr. Galanos?

6          MR. GALANOS:  No questions, Judge.

7          MR. MEHLICK:  Just one.

8          THE COURT:  Mr. Mehlick.

9                    REDIRECT EXAMINATION

10    BY MR. MEHLICK:

11        Q.  Mr. Beckner, the reason you never came

12    forward to correct that affidavit is because it's

13    true; right?

14        A.  That's correct.

15         MR. MEHLICK:  Nothing else.

16         THE COURT:  Mr. Robinson.

17                    RECROSS EXAMINATION

18    BY MR. ROBINSON:

19        Q.  Just one as a follow-up to that.  You've

20    already admitted, Mr. Beckner, that you can't

21    remember even two and a half years ago, much less

22    five.  How is it that you can now testify to

23    Mr. Mehlick's question that you know categorically

24    that it is true that your affidavit is true when you

25    don't know how many others exist, and you've just

1    testified that.  Do you remember that?

2        A.  Yes, I remember that.  And the answer to

3    your question is, you're both right.  I don't

4    remember -- I doubt whether there was any sent.

5        Q.  Were you made to sign your affidavit, or did

6    you have an option to refuse to include all of these

7    paragraphs?

8        A.  No, I was not made to sign it.  And no, I

9    didn't have the option.

10       Q.  Did you read it before you signed it?

11       A.  Yes, sir, I did.

12           MR. ROBINSON:  Nothing further.

13           MR. MEHLICK:  Nothing further.

14           THE COURT:  Anything further.

15           MR. STONE:  Nothing further.

16           THE COURT:  Thank you.  You may step down.

17       (The witness was excused.)

18           THE COURT:  Mr. Mehlick, your next witness.

19           MR. MEHLICK:  Terry Durr.

20       (The witness was sworn.)

21                   TERRY DURR

22    called as a witness herein, having been duly sworn,

23    was examined and testified as follows:

24

25

<pre>
 1              DIRECT EXAMINATION

 2   BY MR. MEHLICK:

 3        Q.   Would you state your name for the record.

 4        A.   Terry Durr.

 5        Q.   Spell your last name for the court reporter.

 6        A.   D-u-r-r.

 7        Q.   What is your present occupation?

 8        A.   I'm a correctional officer with the rank of

 9   lieutenant that is assigned as superintendent of the

10   jail.

11        Q.   And how long have you been employed by the

12   Sangamon County Jail?

13        A.   Nineteen and three quarters years.

14        Q.   And what was your position in October or

15   November of 2007?

16        A.   Superintendent.

17        Q.   I'm going to hand you what's been previously

18   marked as Plaintiff's Group Exhibit D, and refer you

19   to one of the exhibits in there, an affidavit, and

20   ask you if you can identify that for the Court,

21   please.

22        A.   Yes.  It's an affidavit that I signed.

23        Q.   And when did you sign that?

24        A.   March 8th of 2011.

25        Q.   I'm going to direct your attention to
</pre>

1    Paragraph 8 of that affidavit, and ask you to tell

2    the Court what you meant by the term, "regarding

3    this case"?

4        A.  The incident that happened on November 16th.

5        Q.  I'm going to show you what's been previously

6    marked People Exhibit -- excuse me, Plaintiff's

7    Exhibit B for identification, and ask you to take a

8    look at that.

9        Do you know what that is?

10       A.  A copy of an e-mail that Ron Beckner sent

11   out.

12       Q.  And are you carbon copied on that e-mail?

13       A.  Yes, I am.

14       Q.  And do you consider this to be an e-mail

15   regarding this case?

16       A.  No, because it doesn't deal with anything

17   that happened on November 16th.

18       Q.  At the time you signed your affidavit, did

19   you recall that e-mail?

20       A.  No, I did not.

21       Q.  If you had been handed that affidavit --

22   excuse me, that e-mail prior to your signing your

23   affidavit, would you have still signed an affidavit

24   saying you hadn't sent any e-mails regarding this

25   case?

1      A.  Would have still signed it, yes.  Doesn't

2  have anything to do with the incidents that occurred

3  on November 16th.

4      Q.  Now, you have provided counsel, which we

5  have provided to the plaintiff's attorney, copies --

6  hard copies of e-mails that you had back in October

7  and November of 2007; is that correct?

8      A.  Yes.

9      Q.  After this incident, how did that come

10  about?  How did those get to be made into hard

11  copies?

12      A.  I printed out my e-mails.  I don't remember

13  when I did that, but I printed them out sometime

14  after the incident.  And printed out all the e-mails

15  that I had and turned them over to counsel.

16      Q.  And didn't you also even make copies and

17  preserve any notes or written notes or anything you

18  could find that might have anything to do with this?

19      A.  Yes, I did.  Anything that I wrote down on

20  the case I provided to counsel.

21      Q.  And prior to signing this affidavit, did you

22  review the hard copies that you had made of your

23  e-mails?

24      A.  Yes.  And I did not see this e-mail in that.

25      Q.  And -- but was there any other e-mails

1    regarding this case?

2        A.  No.  Other than --

3        Q.  To attorneys?

4        A.  -- to the attorneys.

5        Q.  Right.

6        Now, was it policy of the Sangamon County Jail

7    to document major incidents by e-mails back in

8    October and November, 2007?

9        A.  No.

10        Q.  How are they documented?

11        A.  There is a New World System AEGIS that they

12    wrote the reports in and they were saved in that

13    report system.

14        Q.  Are these --

15        A.  And then there was another report that they

16    would do, it was an unusual occurrence report that's

17    a hard copy that is handwritten or -- the cover of

18    it is, and then they attach the reports from AEGIS

19    and give it to DOC.

20        Q.  Are all of those reports preserved?

21        A.  Yes.

22        Q.  There is no 180 deletion policy on those?

23        A.  No.

24        Q.  What about DARs?  We heard about the daily

25    activity reports; are those are all preserved?

1    A.  They're all preserved.

2    Q.  There's no 180 day deletion?

3    A.  No.

4    Q.  Is that where incidents regarding -- daily

5    incidents regarding inmates are put?

6    A.  Yes.

7    Q.  And those were all preserved?

8    A.  Yes.

9        THE COURT:  Why do you give them to DOC?

10   A.  Part of the -- any unusual occurrence we

11   send to DOC.  They're in charge of standards for

12   corrections, so we -- any reports of an unusual

13   occurrence; somebody going to the hospital, a fight,

14   a rape, or anything like that, is -- the reports are

15   made and then they are sent to DOC.

16       THE COURT:  Okay.

17   Q.  And you looked for e-mails prior to signing

18   this affidavit?

19   A.  Yes.

20   Q.  And it's your opinion that this affidavit is

21   still true today as it was the day you signed it?

22   A.  Yes.

23       MR. MEHLICK:  I don't have any other

24   questions.

25       THE COURT:  Mr. Robinson.

1          MR. ROBINSON:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3    BY MR. ROBINSON:

4        Q.  I'd like to inquire, Mr. Durr, about your

5    answer to counsel's question as to what the term

6    "regarding this case" means.  It's in Paragraph 8 of

7    your affidavit.  Do you have a copy of it?

8        A.  No.  He just took the copy of my affidavit.

9        Q.  Tell us again what you claim you meant when

10   you used the term "regarding this case" in Paragraph

11   8 of your affidavit?

12       A.  Of the incident on November 16th.

13       Q.  Where does it say that?

14       A.  Well, that paragraph doesn't say that.

15       Q.  You know what the common meaning of

16   regarding this case would be if it was read by,

17   let's say, a federal judge or maybe an attorney for

18   Mr. Carlock or someone on the street?

19       A.  I don't know what their understanding would

20   be of that.

21       Q.  So you're -- but you're trying to tell us

22   that the -- regardless of what it would have common

23   meaning of, regarding this case, as you used it or

24   as you were thinking about it when you signed the

25   affidavit, was limited only to what happened to

1    Mr. Carlock the day he died in the jail on

2    November 16th, 2007.

3             MR. MEHLICK:  I objection, Your Honor, to

4    that it's a compound question.  He has never agreed

5    to what the common meaning of that term is and

6    that's how he started out his phrase, by saying

7    isn't it the common meaning of this, and then he

8    went on and asked his question.

9             THE COURT:  The objection is overruled.

10   Mr. Durr, you can answer.  Lieutenant, excuse.

11        A.  What's the question?

12            THE COURT:  Could you read back, Kathy.

13        (Whereupon the requested material was read.)

14        A.  That's what I believed when I signed this,

15   that we didn't have any e-mails from November 16th

16   on this case.

17        Q.  Did you have any discussions with anyone

18   involving the meaning of this Paragraph 8?

19        A.  I don't believe so, no.  I mean...

20        Q.  What did you do -- counsel asked you did you

21   look for e-mails involving Mr. Carlock.  What did

22   you do on or before the day you signed this

23   affidavit, which I believe was March 8th, 2011?

24        A.  Looked through our e-mails that I had hard

25   copies of.

1　　　　Q.　And what did you look through?

2　　　　A.　The actual hard copies of the e-mails.

3　　　　Q.　Were those the e-mails that you provided to

4　Mr. Blodgett for the Burris case?

5　　　　A.　No.　They're the e-mails that I -- I don't

6　know what case -- they were provided to

7　Mr. Blodgett, but I don't know what case he used

8　them for.

9　　　　Q.　Your Honor, I'm going to, if I may approach

10　the witness.　This has already been marked in this

11　case as a group Exhibit G.　And it's on the

12　Plaintiff exhibit and witness list it's described as

13　e-mails from Durr.

14　　　　If I may, sir, I'd like you to hand this packet

15　and have you thumb through it and just see if this

16　is, in fact, what you're referring to just now in

17　your answer.

18　　　　A.　Yes.

19　　　　Q.　Now, I'll represent to you that this was

20　given to plaintiff's counsel by Mr. Blodgett.　Do

21　you know Mr. Blodgett?

22　　　　A.　Yes.

23　　　　Q.　He's retired now, you knew that?

24　　　　A.　Yes.

25　　　　Q.　And he represents the County and so he would

1  have had authority to give these to us, you presume?

2      A.  I don't know what authority he had.  I gave

3  them to him.  I don't know what in turn that he did

4  with them.  If he gave them to you or if he went

5  through them and took out the privileged e-mails or

6  what not.

7      Q.  And you can't -- you're not testifying here

8  today that these were saved for the Carlock matter

9  as opposed to the Burris case, are you?

10     A.  I didn't save them for a specific case, if

11 that's your question.  I was asked if I had copies

12 of hard e-mails and I turned them over to

13 Mr. Blodgett.

14     Q.  Did you know that these e-mails involving

15 the -- well, involve the Burris case and the medical

16 providers in the jail that had to do with the Burris

17 matter?

18     A.  I knew that there are e-mails in there that

19 were --

20         MR. STONE:  Your Honor --

21         THE COURT:  Hold on.  Let him finish the

22 question.  Did you finish the question?

23     Q.  Yes, I did.

24     A.  Yes.  I knew there was e-mails in there that

25 had to do with our medical providers, yes.

1      Q.  And did you know that these e-mails that you

2  had chosen to prove -- to preserve by printing out

3  perhaps for the Burris case, would be helpful to the

4  County and to the Sheriff's Department in the Burris

5  case?

6      A.  I don't know that -- if I recall the

7  e-mails, I don't recall anything being positive in

8  there for us on the Burris case.

9      Q.  Are you saying that you're absolutely

10  positive, Mr. Durr, that these are all the e-mails

11  that you sent or received during the period of time

12  covered?  I think it's supposedly early October,

13  2007, up through maybe early 2008?

14      A.  I think that when I turned those in, those

15  were the e-mails that I had.  And I turned them over

16  to Mr. Blodgett.

17      Q.  And how did you -- how did you come about

18  preserving these?  Were they printed out by you?

19      A.  I just -- I printed them out.

20      Q.  Did you select e-mails or did you print out

21  all of them?

22      A.  I printed out the ones that I had.

23      Q.  Now, you -- you had your own computer back

24  in October and November of 2007, didn't you?

25      A.  Yes.

1        Q.  So you could have sent, as you did, e-mails

2   on Mr. Carlock, Mr. Burris, the medical providers in

3   the jail and so forth; isn't that true?

4        A.  You're asking if I could have?

5        Q.  Yes.

6        A.  I could have, but I don't recall sending any

7   e-mails on the Carlock case -- other than to our

8   attorneys, on the Carlock case.

9        Q.  And how many years before you made that

10  categoric statement in your affidavit to this Court

11  was it that you're speaking about?  It was about

12  three and a half years, isn't that true?

13       A.  On my affidavit?  Is that the question?

14       Q.  Yes.

15       A.  It would have been three and a half years,

16  yes.

17       Q.  So you're telling this Court that you can

18  certify unequivocally, categorically, that you

19  didn't send or receive any e-mails that dealt with

20  Mr. Carlock?

21       A.  I don't believe I sent any.  And the only

22  e-mail that would -- that I received looks like the

23  one that Mr. Beckner had sent and CCd me, which I

24  don't remember seeing.

25       Q.  When you --

1      A.  Or receiving.

2      Q.  When you signed your affidavit in March of

3  2011, you knew that most e-mails had been deleted by

4  the County or the Sheriff's computer system, didn't

5  you?

6      A.  I knew that we didn't have access to them.

7  I didn't know what the deletion -- if they had a

8  deletion policy or what happened to the e-mails

9  after we couldn't see them anymore on our e-mail

10 system.

11     Q.  Did you know about the 180 day deletion

12 policy?

13     A.  Not until after this case started and they

14 started talking about it in hearings that came up, I

15 didn't know that there was a policy for 180 day

16 deletion.

17     Q.  Well, as of March 8, 2011, when you signed

18 your affidavit categorically stating that you didn't

19 send any, you knew that most e-mails had been

20 deleted, didn't you?

21     A.  Did I know that most e-mails -- I knew that

22 we didn't have access, we didn't have access to

23 them.

24     Q.  Did you also know at the time that you

25 signed your affidavit in March of 2011, that your

1  old computer was actually gone, and either

2  destroyed, discarded, or in storage somewhere?

3      A.  I don't remember if -- at that time what --

4  if I had my old computer or not.

5      Q.  Do you recall when this Carlock case first

6  came on the radar screen at the Sheriff's

7  Department?  The filing of it?

8      A.  I don't know the exact date, but I think it

9  was in '08.

10      Q.  Let's say March of '08.  If the records

11  would show that would you agree?

12      A.  If that's what the record shows, I'd agree

13  with that.

14      Q.  Did you preserve e-mails at that point?

15      A.  Again, I don't remember the exact date that

16  I saved those e-mails.  At what time period I

17  started printing out my --

18      Q.  Did you ever look for Carlock e-mails --

19      A.  Yes.

20      Q.  -- after receiving a litigation hold or some

21  kind of a directive?

22      A.  I don't believe I did, no.

23      Q.  Did you ever know how to delete e-mails from

24  your computer?

25      A.  Delete them?

1      Q.  Yes.

2      A.  Yeah, I know how to delete e-mails, if

3  that's --

4      Q.  Did you -- did you ever know how to archive

5  them and save them?

6      A.  I never archived them.  I didn't know if I

7  knew how to do it properly.  I didn't archive them,

8  though.

9      Q.  So neither Mr. Rovey or Paula Tolbert for

10  the County or the Sheriff's Department ever

11  explained to you that -- how to archive e-mails on

12  Carlock or Burris or anyone else for that matter?

13      A.  I don't remember learning how to do it from

14  them.

15      Q.  Now, your affidavit, do you have it there?

16      A.  Yes.

17      Q.  Let's look at another paragraph.  Paragraph

18  4 at the top of page 2.  The last sentence says, and

19  I quote you and your affidavit, "It is not the

20  policy and practice in the jail to use e-mail to

21  create or document incidents or to send e-mails back

22  and forth regarding incidents."  You see that?

23      A.  Yes.

24      Q.  That says it isn't the policy and practice

25  to use e-mail, but it -- what it doesn't say is that

1    is there's no prohibition against using e-mails to

2    talk about Carlock or Burris or any other incident,

3    is it?  Is there?

4         A.  It doesn't say there's any prohibition.  No,

5    it doesn't.

6         Q.  And in fact, there is no written policy in

7    the County or in the Sheriff's Department that says

8    what your sentence says?

9         A.  Well, we have a policy that when there's an

10   incident, they have to do a report.  And the report

11   has to be put on the computer system and the reports

12   have to be turned over to Department of Corrections.

13   That's what this is referring to, is that whenever

14   there's an incident we deal with, that incident is

15   put in the computers and saved there.  It's not put

16   in e-mails.

17        Q.  Mr. Durr, that's not what your sentence in

18   Paragraph 4 says.  It says it's not the policy to

19   use.  You've already admitted that doesn't prohibit

20   the use of e-mails.  My question was, do you have a

21   written policy that says what your sentence in

22   Paragraph 4 says?

23             MR. STONE:  Judge, I believe we're getting

24   argumentative.  By adverse inference, the rule that

25   says they're suppose to do it the other way

1    indicates that the policy is not to do it this way.

2    I don't know what the answer to this question --

3              THE COURT:  Mr. Stone, you forget I use to

4    be an English teacher.  I agree with you.  But you

5    may answer the question.

6        A.  It's the policy to write the reports and put

7    them in the -- into the AEGIS New World System.

8        Q.  But there's no policy against using e-mails?

9        A.  There's no policy against using e-mails for

10   anything.

11       Q.  Okay.  And so we don't know how many e-mails

12   involving Mr. Carlock during October or November or

13   since have been circulated inside the jail or

14   Sheriff's Department, do we?

15       A.  I do not know.

16       Q.  And this previously marked Exhibit G that I

17   just showed you, do you recall that?

18       A.  Yes.

19       Q.  It contains references to specific inmates,

20   perhaps not Carlock, but it refers to Burris and

21   other inmates, does it not?

22       A.  I think that the majority of those are like

23   routine business.  They don't specifically deal with

24   incidents.  Some of them deal with correctional

25   officers.

1      Q.  Now, do you -- do you know what your
2  paragraph 8 means when it says, "I did not send or
3  receive any e-mails"?
4      A.  You mean you're stopping that sentence
5  there?
6      Q.  Yes.
7      A.  The question is I did not --
8      Q.  What is that suppose to mean?
9      A.  That I -- this sentence in the completion of
10  the whole sentence.  I did not send or receive
11  e-mails regarding this case except for e-mails my
12  attorney -- with my attorney.  That's what I
13  believed when I signed this.
14      Q.  What I'm getting at, Mr. Durr, is that
15  generically that means that your computer didn't
16  send and your computer didn't receive according to
17  this statement.  Would that be correct?  Anything
18  other than what you claim to be privileged
19  attorney/client communications?
20      A.  You're saying my computer didn't receive any
21  e-mails?  Any e-mails, whether this case or not?  Is
22  that the question?
23      Q.  No.  Because you parsed your words regarding
24  this case, I want to make sure that we are
25  understanding each other in terms of what does send

1    and receive mean in terms of e-mails?

2        A.  Exactly what they mean.

3        Q.  So if you received a copy of an e-mail,

4    that's receiving it; correct?

5        A.  Yes.

6        Q.  And so when you received the copy of the

7    Beckner e-mail dated October 17, 2007, regarding

8    Mr. Carlock and the DAR reports, that was receiving;

9    correct?

10       A.  Correct.

11       Q.  And so your affidavit dated March 8, 2011,

12   isn't true, is it, in that regard?

13       A.  No.  That's not true.  Regarding this case

14   and what I was referring to in this is the events

15   that happened November 16, 2000 --

16       Q.  What didn't your affidavit specifically

17   state that if that's what you meant?

18       A.  I don't know.

19       Q.  Did you know that others in your department,

20   namely Mr. Beckner, Mr. Strayer, and several of the

21   others that are here today, were asked to sign or

22   did sign virtually the identical language in their

23   affidavits?

24       A.  I don't know what their exact language is.

25   I know they signed affidavits.

1     Q.  Did you all talk among yourselves about

2   these affidavits before you signed them?

3     A.  No.

4     Q.  You can't sit here today and unequivocally

5   or categorically, absolutely, tell this Court that

6   there aren't other e-mails that you sent or received

7   regarding Mr. Carlock, can you?

8     A.  I don't believe there are any other e-mails.

9     Q.  Can you absolutely state that as a positive

10  fact as you sit here today, knowing that many

11  e-mails have been deleted?

12    A.  After reviewing everything that I've

13  reviewed, I don't believe there is any other

14  e-mails.

15    Q.  So are you saying that there aren't any and

16  you're willing to rest on that under the penalties

17  of perjury in this case and in this courtroom?

18    A.  I said I don't believe that there are any

19  other e-mails --

20    Q.  But there could be?

21    A.  -- that I know about.

22    Q.  But there could be?

23    A.  You're asking me to speculate on something.

24    Q.  Would you say pretty much anything under

25  penalties of perjury if it helped your case?

1        A.  No, I would not.

2        Q.  Do you know what a litigation hold is?

3        A.  Yes.

4        Q.  Did you know in March of 2008, what a

5   litigation hold was?

6        A.  I don't know if I did or didn't at the time.

7        Q.  Did you ever attend any courses or meetings

8   in the department to learn about litigation holds

9   and what needed to be preserved?

10       A.  Yes.  Later on we had some discussions about

11   litigation hold meetings.

12       Q.  Did you -- did you ultimately learn that

13   litigation hold means all evidence, which can

14   include audio, video, ESI, or e-mails and that type

15   thing?

16       A.  Yes.

17       Q.  Did you know that in 2007?

18       A.  I don't know if I did or didn't.

19       Q.  Were you a part of the litigation hold

20   meetings that were held in -- at some point in the

21   department?

22       A.  I remember having a meeting about litigation

23   and being told about -- we got letters about what

24   needed to be held and listed those type of things.

25   And we were talked -- somebody came and talked to us

1    about what we need to hold and stuff.

2        Q.  And finally, Mr. Durr, you've known for

3    several weeks that the truthfulness of your

4    affidavit has been questioned in this case by the

5    plaintiff; isn't that true?

6        A.  Yes.

7        Q.  And you haven't taken any steps prior to now

8    to withdraw or clarify or correct your affidavit,

9    even though you know that you did send or receive in

10   this case, at least one has been found regarding

11   Mr. Carlock?

12       A.  I believe the statements that I made in my

13   affidavit are true, and I believed that when I

14   signed it.

15       Q.  And that's based on your -- your explanation

16   of what you meant, I take it, by the words

17   "regarding this case".  Would that be true?

18       A.  Yes.

19       Q.  And so if the -- if the Court were to decide

20   that the words "regarding this case" don't

21   necessarily mean what you're now claiming they mean,

22   this is a false affidavit?

23           MR. MEHLICK:  Your Honor, I object to that.

24           THE COURT:  The objection is overruled.

25   Lieutenant, you can answer.

1       A.  You want me to speculate what the Court's

2    going to rule on this?

3       Q.  I said if the Court were to find that that

4    language "regarding this case" is not limited to

5    just what happened in an hour or two or November 16?

6       A.  Well, you're asking me to speculate as to

7    what the answer would be to that and make a legal

8    conclusion on it.

9       Q.  So you're objecting to my question, too?

10          MR. STONE:  I was about ready to make the

11   same objection.  Does call for a legal conclusion.

12          THE COURT:  He answered.  He answered.

13          MR. ROBINSON:  That's fine.  Thank you,

14   Your Honor, nothing further.

15          THE COURT:  Mr. Stone.

16          MR. STONE:  Nothing.

17          THE COURT:  Mr. Biswell, Mr. Galanos?

18          MR. BISWELL:  Nothing.

19          MR. GALANOS:  No.

20          MR. MEHLICK:  No questions.

21          THE COURT:  Thank you, Lieutenant.  You may

22   step down.

23       (The witness was excused.)

24          THE COURT:  We're going to take a five

25   minute break.  We have three other short witnesses;

1    is that correct?

2    　　　　MR. MEHLICK:  Short as far as I'm

3    concerned.

4    　　　　THE COURT:  All right.  We'll take a short

5    break.

6    　　(Whereupon a break was taken.)

7    　　　　THE COURT:  Please be seated.  Court is

8    reconvened.  Your next witness, Mr. Mehlick.

9    　　　　MR. MEHLICK:  William Strayer.

10    　　(The witness was sworn.)

11    　　　　　　　　WILLIAM STRAYER

12    called as a witness herein, having been duly sworn,

13    was examined and testified as follows:

14    　　　　　　　　DIRECT EXAMINATION

15    BY MR. MEHLICK:

16    　　Q.  Would you state your name for the record,

17    please?

18    　　A.  Yes.  It's William Strayer.

19    　　Q.  Would you spell your last name for the court

20    reporter?

21    　　A.  S-t-r-a-y-e-r.

22    　　Q.  And what is your present occupation?

23    　　A.  I am assistant superintendant at the

24    Sangamon County Jail.  With the rank --

25    　　Q.  How long -- Pardon me.

1      A.  With the rank of lieutenant.

2      Q.  And how long have you been employed by the

3 Sangamon County Sheriff's Department, Sangamon

4 County Jail?

5      A.  25 years.

6      Q.  And back on October, November, 2007, what

7 was your position at that time?

8      A.  It was the same, sir.  I was the assistant

9 superintendent with the rank of lieutenant.

10      Q.  I'm going to show you what's been previously

11 marked Plaintiff's Group Exhibit D, and have you

12 refer to one of the exhibits included in this

13 exhibit, which appears to be an affidavit, and ask

14 you if you recognize that?

15      A.  Yes, sir, I do.

16      Q.  And what is it?

17      A.  It's an affidavit.

18      Q.  And when was it signed?

19      A.  It was signed March 11th, 2011.

20      Q.  That's your affidavit; correct?

21      A.  Yes, sir.

22      Q.  I'm going to direct your attention to

23 Paragraph 3 of that affidavit and ask you to tell

24 the Court what you meant by the term "regarding this

25 case" when you signed that affidavit?

1     A.  When I signed this affidavit, regarding

2   e-mails, it was for the day of the incident,

3   November 16th.

4     Q.  I'm going to hand you what's been marked as

5   Plaintiff's Exhibit B, and ask you to tell the Court

6   what that is?

7     A.  This is an e-mail from Lieutenant Beckner.

8     Q.  And did you receive that e-mail?  Are you

9   carbon copied on it?

10     A.  Yes, I'm CCd on it.

11     Q.  Okay.  Do you recall that -- at the time you

12   signed your affidavit did you even recall that

13   affidavit?  I mean that e-mail, excuse me.

14     A.  No, I did not.

15     Q.  Now that you have seen that e-mail, and if

16   you had had that e-mail at the time you were

17   preparing to sign that affidavit, would you still

18   have signed the affidavit saying you'd had no

19   e-mails regarding this case?

20     A.  Yes, sir, I would have.

21     Q.  And why is that?

22     A.  Because I believe that when I signed this it

23   was on the date of the incident, November 16th.

24     Q.  And does that e-mail have anything to do

25   with that incident?

1       A.  No, sir, it does not.

2       Q.  Would you refer to that as routine business

3  in the jail type thing?

4       A.  This was Lieutenant Beckner being upset that

5  a policy wasn't followed with the DAR being --

6  having proper information in it.

7       Q.  I'm going to hand you what's been filed

8  under seal and marked as Exhibit 4, two e-mails, but

9  I'm only going to have you refer to one.  And ask

10  you what that is?

11       A.  It's an e-mail from Lieutenant Powell.

12       Q.  And was that an e-mail on what date?

13       A.  June 25th of '09.

14       Q.  And that was directed to you?

15       A.  Yes, sir.

16       Q.  And it refers to Carlock cell checks?

17       A.  That's in the subject matter, yes.

18       Q.  Now, did you recall that e-mail when you

19  were signing your affidavit?

20       A.  No, I did not, sir.

21       Q.  If you had that e-mail sitting in front of

22  you prior to signing your e-mail -- prior to signing

23  your affidavit, would you have still signed your

24  affidavit saying what you did?

25       A.  Yes, sir, I would have.

1    Q.  And why would that be?

2    A.  Because I believed that when I signed the

3    affidavit it was for the date of the incident.

4    Q.  Also with regard to this e-mail, did it even

5    talk about anything about Carlock other than saying

6    Carlock cell checks?  What was it referring to in

7    there?

8    A.  Actually, it did not.  It was under the

9    subject matter the name was mentioned, but it

10   referred to Lieutenant Powell's printer being broke

11   and she was sending it for repairs.  And that I must

12   have asked her to check on some cell movements or

13   cell checks --

14   Q.  Regarding Mr. Carlock?

15   A.  It could have been, yes.

16   Q.  Do you know who asked you to do that?

17   A.  It would have been my attorney if I would

18   have done it.

19   Q.  So one of the attorneys, like Mr. Blodgett?

20   A.  Yeah, like Mr. Blodgett, sir.

21   Q.  And then you passed it on to her?

22   A.  Yes, sir.  I would have asked her to maybe

23   check the computers, check the records, see what she

24   could find.

25   Q.  So this was collecting information for your

1    attorney?

2        A.  Yes, sir.  It would have been -- it would

3    have been if Mr. Blodgett asked me to obtain some

4    information, I would have collected any of the

5    information I could have.

6        Q.  So in other words, this was involving

7    attorney/client information?

8        A.  Yes, it was.

9        Q.  Now, the other e-mail; would you take a look

10   at that.  That's included in plaintiff's -- excuse

11   me, that Defendant's Exhibit 4 that was filed under

12   seal.  And what is that?

13       A.  This one here, sir?

14       Q.  Yes.

15       A.  This is an e-mail from Officer Furlong.

16       Q.  And was that from one of the jail computers

17   to you?  Or where did that come from?

18       A.  No.  This was from his personal computer.

19       Q.  And when did he send you that?

20       A.  November 29th of '07.

21       Q.  And did correctional officers, to your

22   knowledge, have any access to computers at the jail

23   to send or receive e-mails?

24       A.  No, sir.  Our -- the only people THAT had

25   access were the administrative people for the jail,

1     our shift supervisors AND our specialty positions at

2     that time.

3          Q.  And this one came from Mr. Furlong from

4     home?

5          A.  Yes, sir.

6          Q.  To you?

7          A.  Yes, sir.

8          Q.  And after reviewing that e-mail, do you

9     believe that e-mail is regarding this case?

10         A.  No, sir, I do not.

11         Q.  Why is that?

12         A.  It's a personal e-mail from Officer Furlong.

13         Q.  Contained personal matters?

14         A.  Yes, sir.  That's what I'm referring to.  It

15    contained a lot of personal matters.  Some problems

16    he was having at home.

17         Q.  If you had been given a copy of that e-mail

18    prior to signing your affidavit, would you have

19    still signed your affidavit saying what you did?

20         A.  Yes, sir.  Because this has nothing to do

21    with reference to that day of the incident, it

22    happens to refer to Officer Furlong having some

23    personal matters.

24         Q.  It's been covered before, but just briefly,

25    the major incidents in the jail, how are they

1   handled?  Are they done by e-mails or reports?

2        A.  No, sir.  We do it on computers.  We do it

3   in a report form that's generated and saved.  We do

4   not do any reports on e-mails.

5        Q.  Prior to signing your affidavit after

6   March 11, that you have in your hand there, did you

7   look for e-mails?  Did you try to find any e-mails

8   which you may have had regarding this case?

9        A.  Yes, sir, I would have.

10       Q.  And did you find anything?

11       A.  No, sir.  I don't believe I've turned any

12  in.

13       Q.  Did you even know how to save, or what

14  people refer to; that are more technically advanced

15  than me, archive e-mails?  Did you know how to do

16  that back then?

17       A.  Actually no.  I have a hard time with

18  computers.

19       Q.  Do you know how to delete an e-mail?

20       A.  I know there's a delete function there.

21       Q.  Do you know anything about preserving them,

22  or did you know anything about 180 day deletion

23  policy or anything like that at that time?

24       A.  In October -- not until more recently.

25       Q.  And did you ever delete any --

1          A.  I don't --

2          Q.  Regarding Mr. Carlock?

3          A.  No.  In regard -- no.

4               MR. MEHLICK:  I don't have any further

5      questions.

6               THE COURT:  Mr. Robinson.

7               MR. ROBINSON:  Thank you, Your Honor.

8                         CROSS EXAMINATION

9      BY MR. ROBINSON:

10         Q.  Would you tell the Court what all you have

11     done regarding this case since it began?

12              MR. MEHLICK:  Excuse me?

13         A.  That's what I was going to say.

14         Q.  Do you not understand my question?

15         A.  I've done a lot of things, sir, but I don't

16     understand the specific question.  I don't --

17         Q.  What is it you don't understand about the

18     question?

19         A.  Where do you want me to start?

20         Q.  Well, I want you to start with your

21     understanding of my question.  What have you done

22     regard this case?

23              MR. MEHLICK:  Your Honor, I object.  That's

24     a very broad question.  I mean --

25              THE COURT:  Could you limit it in time in

1   some fashion?

2        Q.   Your Honor, my response is that that is

3   absolutely our point.   It is a very broad question.

4   Just like it is to state, "I did not send or receive

5   any e-mails regarding this case."   That is a very

6   broad statement.   And should refer to anything

7   regarding Mr. Carlock.   Before November 16 or since.

8   It says regarding this case.   So I'll rephrase the

9   question.   But that's our point.

10        You claim, Mr. Strayer, now, in reflection,

11   that your words "regarding this case" only refer to

12   whatever you did on November 16, 2007; is that

13   correct?

14        A.   I'm referring to e-mails that were on -- for

15   that date for that case for November 16th, yes.

16        Q.   That's what you're claiming now, that those

17   records "regarding this case" mean in your -- in

18   paragraph 3 of your affidavit; correct?

19        A.   That was my belief on November 16th.

20        Q.   Can you explain that?

21        A.   I thought I just did.

22        Q.   Can you explain your belief or what lead you

23   to believe that?

24        A.   It's -- that's what I interpreted this to

25   be.

1     Q.  I thought it was a broad concept regarding
2  this case?
3     A.  Sir, I knew I had e-mails on this case to my
4  attorney, but I did not send or receive any e-mails
5  regarding this case other than to my attorney.
6     Q.  Would you agree that Mr. Carlock is the
7  subject of this case?
8     A.  Mr. Carlock is the lawsuit, yes.
9     Q.  Well, do you understand what the word case
10  means?
11     A.  Yes, but what I -- yes, I do.
12     Q.  It refers to this litigation?  Right here,
13  right now; isn't that true?
14     A.  I would say.  Yes.  If you want the word
15  yes.
16     Q.  So these three e-mails that you sent or
17  received dealt with Mr. Carlock, didn't they?
18  You've testified already about them a little bit.
19     A.  I've testified about them, but it didn't
20  have anything to do with the day November 16, which
21  is what I believed the case meant.  And that's what
22  I believed my affidavit meant when I signed it.
23     Q.  So according to your very limited and
24  self-serving interpretation of the three words
25  "regarding this case", you claim your affidavit is

1    reasonably correct and not false; is that true?

2        A.   I believe my affidavit is correct.

3        Q.   But it assumes that the words "regarding

4    this case" apply only to e-mails sent or received on

5    November 16, 2007, according to your testimony.  Is

6    that correct?

7        A.   Sir, I don't believe any of these three

8    e-mails that were shown to me have anything to do

9    with November 16th, and that is yes.

10       Q.   So the answer to the question is yes, you

11   believe that those three words are limited to

12   e-mails that were sent or received on November 16,

13   2007?

14       A.   For the incident of November 16, 2007.

15       Q.   Now, let me turn your attention to the

16   e-mail that you sent to Christopher Wedel.  Do you

17   have a copy of it in front of you?

18       A.   No, sir.

19       Q.   I'll represent to you that this is from

20   fragments discovered by the defendant's expert,

21   Mr. Patrick.  See if you recognize any portion of

22   that.  It's addressed to Christopher Wedel.  And

23   it's signed off, "Thanks, Strayer."  The first

24   question is, would that be you?

25            MR. STONE:  Mr. Robinson, would we be

1    permitted to take a look at what you're referring

2    to?

3         MR. MEHLICK:  Can you give us the date on

4    that?

5       Q.  Do you see it?

6       A.  Yeah, I see it.

7       Q.  Is that you, Strayer?

8       A.  Strayer is me.

9       Q.  Are there any other Strayer in the Sangamon

10   County Sheriff's Department?  Is there any other

11   Strayer?

12      A.  No.

13      Q.  This is addressed to Christopher Wedel.  Do

14   you know him?

15      A.  Yes, I do.

16      Q.  Can you tell the Court who he is, as far as

17   you know?

18      A.  He's one of our IT people.

19      Q.  Okay.  Your e-mail says, "Did you ever make

20   a CD on e-mails or anything else involving Carlock,"

21   with about 10 or 12 question marks.  "Sorry to

22   bother you while you're gone, but I also told you to

23   turn off your phone.  Thanks, Strayer."

24        Did you read that?

25      A.  Yes.  Would you like me to explain it?

1      Q.  I'm about to ask you, yes.  That has to do

2   with Carlock; correct?  And it has to do with

3   e-mails; correct?

4      A.  It says Carlock and it says e-mails, yes.

5      Q.  Is it limited in when e-mails were sent in?

6   They could have been sent in October of 2007, they

7   could have been sent on November 16, 2007, they

8   could have been sent last week.  Or at least the day

9   before you wrote this, I guess.

10      A.  Okay.

11      Q.  Is that true or not?

12      A.  Can you repeat it.  Or can she repeat it.

13      Q.  This could have referred to e-mails that

14   were sent or received on November 16, 2007, about

15   Mr. Carlock?

16      A.  It could have.

17      Q.  So you sent this to Mr. Wedel?

18      A.  Yes.

19      Q.  Why did you send it to him?

20      A.  For my attorney.

21      Q.  Okay.  Did you ever get a response from him?

22      MR. MEHLICK:  Your Honor, I object.  He

23   just said it's with regard to an attorney asking him

24   for stuff.  It's attorney/client privilege.

25      MR. ROBINSON:  This communication isn't

1    privileged, Your Honor.

2        THE COURT:  The communication itself isn't.

3    Did you receive a response?

4        A.  No, I did -- if I did, i do not -- I'll

5    answer your question for you.  On the second

6    sentence, the guy was out of town on vacation.

7        Q.  So this is another e-mail, in addition to

8    the two you testified on to Mr. Mehlick, that had to

9    with Carlock; correct?

10        A.  Sir, this was an e-mail for my attorney.

11    This has nothing to do with my affidavit, because in

12    my affidavit I stated that.

13        Q.  Mr. Wedel is not an attorney, is he?

14        A.  No.  It was information I was gathering for

15    my attorney.

16        Q.  Well, this communication is not to your

17    attorney, is it?

18        A.  No.  It's information I was gathering for my

19    attorney.

20        Q.  And you said he didn't respond as far as you

21    know?

22        A.  Not to my knowledge.

23        Q.  So you wrote yet another e-mail specifically

24    about asking Mr. Wedel in the IT department about

25    Carlock e-mails, didn't you?

1          A.    That's what it says.

2          Q.    And now that's in addition to the other two

3     that you've described, one sent by Furlong and the

4     other one sent by Lieutenant Powell, Tammy Powell.

5     Would that be true?  So there are three that we've

6     found so far that have been deleted?

7          A.    There's three that were found, because this

8     one was a surprise to me.

9          Q.    Do you know how many others exist were you

10    sent and received e-mails maybe even about

11    November 16, 2007, that have been deleted?

12         A.    Are you asking me if I sent an e-mail on

13    November 16, 2007?

14         Q.    I'm asking you, sir, how do we know that

15    there aren't many other e-mails that you sent or

16    receiving regarding Mr. Carlock?  Whether on

17    November 16, 2007, or some other date since then?

18         A.    Sir, this was, as far as I was concerned was

19    attorney/client privilege.  And there is no others

20    that I believe.

21         Q.    What did you do to assure yourself that your

22    affidavit was true before you put your signature on

23    it in March of 2011?

24         A.    I looked through my computer trying to find

25    any e-mails.

1          Q.   That was the new computer, wasn't it?  The

2     one that was installed in 2009 or so.  Your old

3     computer you didn't have anymore, did you?

4          A.   If you say I didn't, I didn't.  I know I

5     have a new one.  I don't know when it was installed

6     and when it wasn't.

7          Q.   So if you looked through this so-called new

8     computer, if it was installed according to the IT

9     people in 2009 or maybe '10, it likely wouldn't have

10    many, if any, Carlock e-mails, would it?

11         A.   Sir, I believe all the information on my old

12    computer was transferred to my new one.

13         Q.   How do you know that?

14         A.   That's what I believe I was told.

15         Q.   Who told you that?

16         A.   It would have been the people that installed

17    the computer.

18         Q.   Who did that?

19         A.   Sir, I don't remember which individual

20    installed my computer.

21         Q.   Now, you told -- you told the Court here

22    just now under oath that you hardly know much about

23    computers.  You testified to Mr. Mehlick you don't

24    know really much about archiving or preserving

25    e-mails or anything like that.  Is that true or not

1    true?

2         A.  True.  I'm learning as I'm going.  I'm still

3    learning.

4         Q.  Okay.  So is it true that basically, you

5    just signed this affidavit without doing much

6    thinking or investigating?

7         A.  No.  I looked through my computer for any

8    e-mails I would have had concerning Carlock.  On

9    November 16.

10        Q.  Were you aware that federal perjury is a

11   crime?

12        A.  Yes, sir.

13        Q.  Did you take this affidavit seriously before

14   you signed it and allowed it to be submitted to this

15   Court.  To us?

16        A.  I took it very serious.

17        Q.  Turns out that if the language in this

18   affidavit is untrue, then your affidavit is false;

19   isn't that correct?

20             MR. MEHLICK:  Calls for speculation, Your

21   Honor.  Leading the witness.

22             THE COURT:  The objection is overruled.

23   You may answer.

24        A.  So you're asking me to speculate whether I'm

25   going to know what the Court's going to rule?

1      Q.   No, I'm not asking you to speculate what the
2   Court's going to rule at all.  I asked you before
3   about the meaning of words, simple words.
4      A.   To me the word, when it says any e-mails
5   received regarding this case, I was referring to
6   November 16th incident.
7      Q.   Your -- you've been involved in litigation
8   before, haven't you?  Even civil litigation in the
9   Sheriff's Department?
10     A.   I've been involved in litigation.
11     Q.   So you know what litigation is or what a
12   case is?  A litigation case?
13     A.   Okay.
14     Q.   And you know it has many aspects?  It has
15   lots of hearings sometimes, it has trials, it has
16   discovery, it has depositions?
17     A.   Okay.  Yes.
18     Q.   So those are all regarding this case?
19     A.   Sir, when I read this my belief was any
20   e-mails regarding that day, November 16th.
21     Q.   Now, you've known for several weeks that
22   your affidavit has been questioned as being false,
23   have you not?
24     A.   Yes.  That's why we're here.
25     Q.   And yet you have not done anything to either

1  withdraw this affidavit, request your attorneys to

2  do so apparently, or to correct it; isn't that true.

3      A.  I'm not asking anybody to correct it because

4  I believed it was true when I signed it.

5      Q.  It turns out it's not true, isn't it?

6      A.  Are you speculating or am I suppose to?

7      Q.  I'm asking you the question, Mr. Strayer.

8      A.  I'm saying that when I signed this I felt

9  this e-mail meant on November 16, was there an

10  e-mail sent regarding November 16th.

11      Q.  That's what you thought it meant?

12      A.  Yes, sir.

13      Q.  And we just had you identify and look at an

14  e-mail, which I want to mark as an exhibit before we

15  conclude here today, but we have this e-mail that

16  you wrote regarding Carlock and whether any e-mails

17  were preserved.

18      A.  Sir, I was doing that for my attorney.

19         MR. ROBINSON:  Okay.  I think that's all I

20  have, Your Honor.

21         THE COURT:  Mr. Stone.

22         MR. STONE:  No.  Thank you, Your Honor.

23         MR. BISWELL:  No questions.

24         MR. GALANOS:  No questions.

25         MR. MEHLICK:  No questions.

1      A.  I do.  Who do I give these back to.

2           MR. MEHLICK:  Give them to me.

3           MR. ROBINSON:  Your Honor, before we move

4  on, I would like to mark that, if I may.  This

5  exhibit.

6           THE COURT:  Is that a copy he can mark,

7  Mr. Mehlick?

8           MR. MEHLICK:  That's his.

9           THE COURT:  That's his, okay.  Go ahead and

10  call your next witness.

11          MR. MEHLICK:  Tammy Powell.

12      (The witness was sworn.)

13                    TAMMY POWELL

14  called as a witness herein, having been duly sworn,

15  was examined and testified as follows:

16                 DIRECT EXAMINATION

17  BY MR. MEHLICK:

18      Q.  Would you state your name, please?

19      A.  Tammy Powell.

20      Q.  How do you spell your last name?

21      A.  P-o-w-e-l-l.

22      Q.  What is your present occupation?

23      A.  I am lieutenant in the Corrections Division

24  for the Sangamon County Sheriff's Department.

25      Q.  And back in October and November, 2007, what

1  was your position with the Sangamon County Jail?

2       A.  I was a lieutenant in Corrections Division.

3       Q.  How long have you been employed by the

4  Sangamon County Sheriff's Department Corrections

5  Department?

6       A.  14 years.

7       Q.  I'm going to hand you what's previously been

8  marked Plaintiff's Exhibit D and direct your

9  attention to one of the exhibits in that group.  And

10  could you tell the Court what that is?

11      A.  An affidavit.

12      Q.  And whose affidavit is it?

13      A.  Mine.

14      Q.  When was it dated?

15      A.  March 11th, 2011.

16      Q.  And I'm going to direct your attention to

17  Paragraph 3 of that affidavit and ask you to tell

18  the Court what you meant when the used the term,

19  "regarding this case?

20      A.  Anything that happened on November 16th of

21  2007.

22      Q.  I'm going to hand you what's been previously

23  marked as Defendant's Exhibit 4, sealed.  Two

24  e-mails.  And refer you to one of those and ask you

25  to take a look at that for a second.

1    A.    Okay.

2    Q.    Would you tell the Court what that is?

3    A.    This is an e-mail that I sent to Assistant

4  Superintendent Strayer.

5    Q.    And when did you send that?

6    A.    June 25th, 2009.

7    Q.    Now, does that have in the subject matter

8  Carlock cell checks?

9    A.    It does.

10    Q.    But what does the body talk about?

11    A.    It talks about my printer being down, so I

12  couldn't print out the report and send it over to

13  him until my printer was fixed.

14    Q.    And is there also some other routine jail

15  business in there?

16    A.    Yeah.  There's -- and the reports for the

17  cells in B block, with some of them being moved out

18  on day shift and there was no sheets completed.

19    Q.    Now, did Mr. Strayer ask you to get some

20  information about Carlock cell checks?

21    A.    Yes, he did.

22    Q.    And you obtained that information?

23    A.    Yes.

24    Q.    And did you e-mail it to him, or did you

25  give it to him in a report?

1      A.  I gave it to him in a report.

2      Q.  And was the reason that you were saying that

3  you couldn't give him the report in that e-mail

4  because your printer wasn't working?

5      A.  Correct.

6      Q.  So you didn't e-mail anything regarding

7  Carlock cell checks?

8      A.  No.  It was just telling him I won't be

9  able -- my report won't be over there for him when

10  he gets in in the morning because my printer is not

11  working so I can't print it out.

12      Q.  Now, when there are major incidents in the

13  jail, do you document them by reports or e-mails?

14      A.  Reports.

15      Q.  Now that you've seen that exhibit,

16  Defendant's Exhibit 4, with that e-mail from '09; if

17  you had had that sitting in front of you back on

18  March 11, 2011, prior to signing your affidavit,

19  would you have signed your affidavit the same?

20      A.  Yes.

21      Q.  Why is that?

22      A.  Because this has nothing to do with what

23  happened on November 16th.  Carlock's death.

24      Q.  Do you know why Mr. Strayer was asking you

25  to collect this information?  Why -- for an

1   attorney?

2       A.  Not for sure if he said for an attorney.  He

3   just asked me to check -- speak to certain officers

4   and -- that performed cell checks on Mr. Carlock and

5   see what they said.

6           MR. ROBINSON:  Your Honor?

7           THE COURT:  Yes.

8           MR. ROBINSON:  Ms. Kelley has a medical

9   emergency with her father.  Is it all right if she

10  be excused right now?

11          THE COURT:  Yes, absolutely.  Do you need

12  to take a break.

13          MR. ROBINSON:  Well --

14          THE COURT:  Mr. Robinson, I'm going to

15  adjourn court.  We'll reconvene at a later time.

16          MR. MEHLICK:  Are you going to give us a

17  date?

18          THE COURT:  Not now.  I'll send a text

19  order with several choices.

20          MR. MEHLICK:  Okay.

21          THE COURT:  You may stepdown.  Thank you.

22      (Whereupon court was recessed for the day.)

23

24

25

1    I, KATHY J. SULLIVAN, CSR, RPR, Official Court

2    Reporter, certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8

9                    This transcripts contains the

10                   digital signature of:

11

12                   Kathy J. Sullivan, CSR, RPR

13                   License #084-002768

14

15

16

17

18

19

20

21

22

23

24

25

KATHY J. SULLIVAN, CSR, RPR
OFFICIAL COURT REPORTER