## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

ESTATE OF AMON PAUL CARLOCK,    )
JR., Deceased, by Mary L.       )
Andreatta-Carlock, Executor,    )
                                )
    Plaintiff,            )
                                )
    v.                    )   No.  08-3075
                                )
NEIL WILLIAMSON, AS SHERIFF OF  )
SANGAMON COUNTY; ANTHONY        )
SACCO, CHIEF DEPUTY; TERRY DURR, )
JAIL SUPERINTENDENT; WILLIAM    )
STRAYER, ASSISTANT JAIL         )
SUPERINTENDENT; LT. RON BECKNER,)
ADMINISTRATOR OF SANGAMON       )
COUNTY JAIL; LT. CANDACE CAIN;  )
LT. TAMMY POWELL; SGT. TODD GUY; )
CO KEVIN FURLONG; NURSE LEE     )
ANNE BRAUER, R.N.; NURSE NIECEY )
WEST, L.P.N.; NURSE LUCY RAMSEY, )
L.P.N.; JOSEPH MAURER, M.D.;    )
CHAUNCEY C. MAHER, III, M.D. and )
SANGAMON COUNTY,                )
                                )
    Defendants.           )

## OPINION

SUE E. MYERSCOUGH, United States District Judge.

This cause is before the Court on the Motion to Exclude Certain

Testimony and Report of Dr. Marc Stern (d/e 413) filed by the Defendants Neil Williamson, Anthony Sacco, Terry Durr, William Strayer, Ron Beckner, Candace Cain, Tammy Powell, Kevin Furlong, Lee Anne Brauer, Niecey West, Lucy Ramsey, and Todd Guy.  For the reasons that follow, the Motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

In this lawsuit, Plaintiff, the Estate of Amon Paul Carlock, Jr., deceased, by Mary L. Andreatta-Carlock, Executor, alleges that Carlock was a pretrial detainee housed at the Sangamon County Illinois jail from October 9, 2007, until his death on November 16, 2007.  See Fourth Amended Complaint (d/e 138).  The Fourth Amended Complaint contains § 1983 claims for excessive force and deliberate indifference to Carlock's medical needs, as well as several state law claims.  The allegations in the Fourth Amended Complaint include the following: that on November 16, 2007,  Carlock was placed face down, with his hands handcuffed behind his back and his legs shackled;  Defendant Furlong

held Carlock at the back of Carlock's neck and placed a portion of his

285 pounds on Carlock's back both before and after Carlock was tasered;

Carlock became unresponsive and no jail personnel provided medical care

or lifesaving measures; and Defendant Mauer failed to train nursing staff

and correctional officers in the use of CPR and AED.  See ¶¶ 33, 61, 80,

113(M).

The defendants in this case include the County Defendants–Neil

Williamson, Anthony Sacco, Terry Durr, William Strayer, Ron Beckner,

Candace Cain, Tammy Powell, Kevin Furlong, Lee Anne Brauer, Niecey

West, Lucy Ramsey, and Todd Guy–as well as the Medical

Defendants–Joseph Maurer, M.D. and Chauncey C. Maher, III, M.D.

The Motion to Exclude Certain Testimony and Report of Dr. Marc Stern

was filed by the County Defendants.

In August 2010, Dr. Stern prepared a Report (d/e 414-1)

containing his medical opinions regarding the care provided to Carlock.

The Report also contains a copy of Dr. Stern's Curriculum Vitae (CV).

According to the Report and CV, Dr. Stern is a board certified

internist specializing in correctional healthcare.  He has held the positions of Section Head for the VA Division of General Internal Medicine at the University of Buffalo and Chief of the Section of General Internal Medicine and Emergency Services in Albany, New York.  He has also managed correctional health care operations in jail settings, prison settings, and private industry settings.  He has worked with and directly supervised licensed practical nurses (LPNs) and registered nurses (RNs), as well as primary care physicians, facility medical directors, and psychiatrists.  Dr. Stern teaches correctional health care principles. Currently, Dr. Stern is an independent consultant in correctional healthcare and lives in Washington.

In his Report, Dr. Stern gives the following opinions: (1) the failure to provide medication to Carlock on the day of arrival; (2) the failure of custody staff to communicate critical health care information to health care staff; (3) the failure to provide safe care for diabetes; (4) the failure to maintain an adequate health record; (5) the failure of Dr. Maurer to provide adequate care on October 10, 2007; (6) the failure of Dr. Maurer

to provide adequate care on other dates; (7) Dr. Maurer's failure to perform his functions as a Facility Medical Director; (8) the failure to promulgate and follow a formal "accucheck protocol"; (9) the unsafe system for ordering medication for new patients; (10) the unsafe system of conducting 14-day intake assessments; (11) the failure to provide adequate mental health care; (12) the LPNs practicing beyond their safe scope of practice; (13) the failure "to provide for inmate health, safety, and/or welfare during the use of restraints or other restrictions by custody"; (14) the failure of staff to respond effectively to a medical emergency on November 16, 2007; and (15) the failure to properly orient and train personnel.  Report, pp. 5-21.

Dr. Stern's deposition took place on January 21, 2011 (from 9:05 a.m. until 5:15 p.m.) in Springfield, Illinois.  Defendants now move to bar and exclude portions of Dr. Stern's testimony and opinions.

## II.  LEGAL STANDARD

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in Daubert [v. Merrell Dow

Pharm., Inc., 509 U.S. 579, 589 (1993).]" Bielskis v. Louisville Ladder, Inc., 663 F.3d 887, 893 (7th Cir. 2011).  To determine whether to admit expert testimony, this Court must examine whether (1) "the witness is qualified,"(2) "the expert's methodology is scientifically reliable," and (3) "the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" Myers v. Illinois Central R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (quoting Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007)).  The test is a flexible one. Bielskis, 663 F.3d at 894 (the district court performs a gatekeeping function when determining whether to exclude expert testimony).  The party that proffers an expert's testimony must establish the admissibility of the testimony by a preponderance of evidence.  Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009).

To determine whether a witness is qualified as an expert, the court must compare the area in which the witness has "superior knowledge, skill, experience or education with the subject matter of [his] testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990). "Rule

702 specifically contemplates the admission of testimony by experts

whose knowledge is based on experience."  Walker v. Soo Line R.R. Co.,

208 F.3d 581, 591 (7th Cir. 2000).

To aid courts in assessing the reliability of scientific expert

testimony, the Supreme Court, in Daubert, set forth a non-exhaustive list

of "guideposts" for consideration: (1) whether the scientific theory can be

and has been tested; (2) whether the theory has been subjected to peer

review and publication; (3) the theory's known or potential rate of error

when applied; and (4) whether the theory has been "generally accepted"

in the scientific community.  Daubert, 509 U.S. at 593-94; see also

Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002).  In

addition to these factors, the 2000 Advisory Committee's Notes to

Federal Rule of Evidence 702 suggest that a court also consider (5)

whether "maintenance standards and controls" exist; (6) whether the

testimony relates to "matters growing naturally and directly out of

research they have conducted independent of the litigation, or whether

they have developed their opinions expressly for purposes of testifying";

(7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."  Fed. R. Evid. 702 advisory committee's note (2000 amends.) (internal quotation marks omitted).  Because the <u>Daubert</u> inquiry is a flexible one, an expert's testimony need not satisfy each of the above factors to be admissible.  <u>Chapman</u>, 297 F.3d at 687.

In this case, Defendants challenge Dr. Stern's qualifications and the reliability of his testimony.

## III.  ANALYSIS

In their Motion, Defendants assert that Dr. Stern's opinions regarding the use of force, restraint, positional asphyxia, and the effects of the taser should be stricken.  Defendants also argue that Dr. Stern

should be barred from putting forth an opinion on deliberate indifference.

**A.     Dr. Stern's Opinions on Use of Force and the Effects of the Taser**

Defendants argue that Dr. Stern's opinions on the use of force, restraint, positional asphyxia, and the use of the taser should be barred. The bulk of Defendants' argument focuses on the taser opinion.  In fact, the sum of Defendants' argument regarding force and restraint/asphyxia is the following statement: "A review of Dr. Stern's opinions regarding force and restraint/asphyxia shows that the same indicia of reliability for admissibility are also lacking in those areas.  As such, those opinions should be excluded as well."  Def. Mem. p. 12.

Plaintiff asserts that Dr. Stern should be permitted to testify on how the use of force (the November 16, 2007 struggle and the pressure placed on Carlock's abdomen/chest) and the taser contributed to Carlock's death and how the use of force and the taser relate to "medical operation."  Pl. Resp., p. 8.

1.     <u>Dr. Stern's Opinions on Use of Force and the Effects of the Taser as Expressed in the Report and Deposition</u>

In addition to the opinions identified in the Background section

above, Dr. Stern's Report contains the following opinions:

> The cause of death was likely multi-factorial
> including respiratory compromise from the use of
> force superimposed on physical exertion during the
> use of force in a setting of physiologic
> embarrassment due to acute renal failure, lithium
> toxicity, in turn superimposed on pre-existing
> diabetes and non-critical coronary artery disease.
> (Report, pp. 2-3).
>
> It is also my opinion that both the severe
> physiologic challenges Mr. Carlock encountered
> during the use of force on 11/16 were magnified by
> his already debilitated physical health.  In other
> words, he might have died from the use of force
> alone and he might have died from his kidney
> failure/lithium toxicity alone.  However, the
> combination of the two were more lethal. (Report,
> p. 25).

The Report also contains a diagram purporting to show the connection

between various Defendants and their causal link to Carlock's death.

One of the "actions" contained in the diagram is "use of force by custody

staff."  Report, p. 24.

At the deposition, defense counsel asked Dr. Stern about his

opinion that the cause of death was multi-factorial:

> Q.  Now, you indicate that one of the factors is respiratory compromise from the use of force superimposed on physical exertion.  Could you explain that?
>
> A.  (No response)
>
> Q.  And one of my questions is I don't see anywhere in this report where you do any analysis of the use of force at all.
>
> A.  I think what you may – you may be misreading what I wrote.  So could I ask you to ask your question again, please?
>
> Q.  Do you believe that respiratory compromise from the use of force because of the physical exertion contributed to his death?
>
> A.  When you say physical exertion, whose physical exertion are you talking about?
>
> Q.  I'm reading straight from your report on page 2.  You tell me.
>
> A.  No, I realize you are, but that's why I–the physical exertion that I'm talking about here is the patient's physical exertion, not the physical exertion of the officers.
>
> Is that what you understood?

Q.  Well, no.  Could you explain that statement to me and how that enters into it?

A.  Sure.  I just had a feeling we were not connecting.  In looking at the phrase "including respiratory compromise from the use of force superimposed on physical exertion during the use of force,' so there's two pieces here.  Respiratory compromise during the use of force was my understanding from the record that there was pressure being applied to Mr. Carlock's chest and/or abdomen.  Well, chest, and possibly additionally abdomen, which would restricted [sic] his ability to breathe.  So that's what the respiratory compromise part means.

   The physical exertion piece means that if use of force was being used, based on my reading of the record and my knowledge of corrections, that means that the patient was not being cooperative. In other words, he was fighting.  He was resisting. And his action of resisting was a contributing factor.  In other words, he was exerting himself, he's using his muscles, he has to work hard, and that consumes oxygen and puts him in a more vulnerable state.

   So those are the two things, the use of force, which is compromising his ability to breathe, and his fighting that use of force which is using up his resources.

Stern Dep., pp. 144-46 (d/e 414-2).

Additional questions about the use of force followed:

> "Q. [(by defense counsel)] First of all, you don't hold yourself out as a use of force expert.  Correct?
>
> A.  That's correct.
>
> Q.  And you've never had any, in the non-medical sense, never ran a correctional facility.  Correct?
>
> A.  For a period of time at the department of corrections the correctional officers at the mental health facility in the state of Washington department of corrections were under my supervision, under my chain of command.  My involvement in them was minimal, but they were under my chain of command.  So the answer to your question is largely no.
>
> * * *
>
> Q.  Well, my question is do you or do you not agree that it is generally recognized that there has to be control of the inmate population in a correctional facility?
>
> A.  For sure.  And I want to clarify, if you're done with that line of questioning, that I am not an expert in the use of force.  However, I am an expert in that area of use of force that intersects with the medical operation and that's what I believe my comment was about.
>
> Q.  All right.  Thank you.

So you're not here to render an opinion as to the appropriateness of the use of force for the correctional officers that were called upon to gain control of Paul Carlock on November 16, 2007?

A.  No.

Q.  And you would agree, would you not, in your understanding of the event that happened in the early morning of November 16, 2007, that officers responding to Mr. Carlock's tensing up while they were trying to dress him out was a spontaneous use of force as opposed to a planned use of force?

A.  That's my understanding.  Yes.

Stern Dep., p. 159-160.

Plaintiff's counsel asked follow-up questions of Dr. Stern:

Q.  You were asked questions about–I think by counsel Drake, and they were hypothetical I think, about the reasons that–the contributing reasons that Paul Carlock was at risk for arrhythmia.[1]  You were not asked about the effects, the effects of the physical treatment or mistreatment from [t]asering, or the pressure on the back, suffocation. Do you have an opinion whether or not those would be contributing factors to his death?  Or to arrhythmia first?

---

[1] During the deposition, Dr. Stern testified that Carlock was at risk for arrhythmia because his lithium level was high, he was developing renal failure, and he had two underlying diseases–diabetes and hypertension.  Stern Dep. p. 56, 60.

A.     With regard to the [t]aser –

MR. STONE:  Again, foundation.  I don't I didn't see the word "[t]aser" at all in his opinion.

MR. ROBINSON:  It's in the report.

Q.  (By Mr. Robinson) But go ahead and answer. Your objection is noted.

* * *

THE DEPONENT:  With regard to the [t]aser, the literature on the health effects of [t]asers is spotty and not very good.  So the impact – I did not offer an opinion on the effect of the [t]aser because I'm not sure what the effect would be.

  It would also be a function of how long the [t]aser was used.  If, for example, the [t]aser was used for one brief pulse, my opinion is that it would have some affect that I believe, among the various affects that we discussed it would be, one of the lesser, it would be a small affect.

Q.  (By Mr. Robinson) Would it have any impact play [sic] the [t]asering occurred while the individual being [t]asered on the ground being with almost 300 pounds of pressure on his back at the time?

A.  I want to continue what I started to say because it will answer your question.  On the other hand, if the [t]aser was used for a long period of

time, it would have more of an affect.  So, for
example, forgetting about putting any pressure on
the chest, if I [t]aser you and your muscles
continue to contract for a long period of time, that
will have a significant impact on your survivability.

  Similarly, if someone is sitting on the patient and
constricting their ability to breathe and at the
same time you impair their ability to breathe and
move with the [t]aser, then, yes, that would
augment that affect."

Stern Dep., pp. 249-251.  After some additional questions about timing,

Carlock's comorbidities[2], blood tests, and deliberate indifference, the

following exchange occurred:

Q. [(By Mr. Robinson)]: Do you have an opinion
whether if the facts are that Paul Carlock, while he
was handcuffed behind his back and faced down
on the floor in the jail at the time when he became
unresponsive and started turning purple, whether
it would – whether heavy pressure, perhaps even
pressure close to 200 pounds on his upper torso,
pushing down on his upper torso, could cause or
contribute to his death?

MR. STONE: Objection to foundation.

---

[2] Stedman's Medical Dictionary 417 (28th Ed.) defines "comorbidity" as: "A
concomitant but unrelated pathologic or disease process; usually used in epidemiology
to indicate the coexistence of two or more disease processes."

THE DEPONENT: Are you asking me the contribution of the hands being chained behind him, or are you asking me about the entirety of the situation?

Q.  (By Mr. Robinson) I'm just giving you the circumstance, which is I think the facts are not in dispute that he was at the time handcuffed behind his back, face down at the time when the heavy deputy was draped across his upper torso.

A.  So the question is does that constellation of situation impair your ability to breathe and therefore did that impact his survivability?

MR. ROBINSON:  Correct.

MR. STONE:  Same objection.

THE DEPONENT:  And my answer would be yes.

Q.  (By Mr. Robinson) And how would that impact survivability?

A.  Both of those situations, the hands behind the back and the pressure on the chest, would impair the ability to breathe.

Q.  Is anything like that taught in jails, in prisons around the United States, based on your experience?  In other words, that that's not the kind of thing that is appropriate restraint, because it can cause injury or death?

A.  You're really asking me about custody officer training and I do not have an opinion.  There is training that I know of in law enforcement agencies in general about the hog-tied position, that that's not really the situation you're describing, you're describing the pressure and the hands behind the back.  So my answer would be I don't know.

Q.  Does your diagram on page 24 of your report, Doctor, detail the relationships that, in your opinion, were the contributing cases for Paul Carlock's death?

A.  Yes.

Q.  Do you have an opinion whether the use of force on Paul Carlock that you've heard about contributed to his death?

A.  Yes, I have an opinion.  And my opinion is that it contributed.

Q.  What's the basis of that opinion?

A.  My general knowledge of medicine, of human physiology based on the information in the case.

Q.  Is it important to know that while he was face down and handcuffed, and at least partially shackled, that he started turning purple and during that period became unresponsive, even to an ammonia capsule?

MR. STONE: Same objection.

Q.  (By Mr. Robinson) Does that help you arrive
at an opinion, those additional facts?

A.  Yes.

Q.  How do they help you?

A.  Well, both pieces of information that you
added to the scenario tell me something about his
oxygenation and his level of consciousness and
responsiveness.

Stern Dep., pp. 255-258.

Defendants' attorneys then sought to ask follow-up questions.

Attorney Stone wanted to question Dr. Stern about whether he had any

expertise on the effects of the taser on the human body, whether he knew

the difference between "dry stun and art probes," whether he was aware

of "any of the mechanics of the [t]aser involved in the amps, pulse[,] and

ohms," and whether he had "any opinions during the propriety of the use

of the [t]aser or on the use of force."  Stern Dep., p. 263.  Plaintiff's

counsel, however, having earlier indicated that the deposition had

exceeded seven hours, ended the deposition by asking Dr. Stern: "Do you

want to waive, or do you want to read and sign?"  Stern Dep., pp. 262-

63.  Dr. Stern waived signature, and the deposition concluded.  Stern

Dep. at p. 263..

> 2.    <u>Dr. Stern's Opinions on Use of Force, as Expressed in His
> Report, are Admissible But the Opinions on the Use and
> Effect of the Taser are Barred Unless Plaintiff Files a
> Supplemental Report and Makes Dr. Stern Available for a
> Supplemental Deposition at Plaintiff's Expense</u>

Defendants argue that Dr. Stern's opinions on use of force,

restraint, positional asphyxia, and the effects of the taser should be

barred because (1) the opinions were not disclosed in his report in

violation of Rule 26; (2) Dr. Stern has no particular education, training,

or experience in these areas nor has he been previously qualified as an

expert in these fields; (3) Dr. Stern did not review the reports of the

participants in the struggle of November 16, 2007 (except for a few pages

of one correctional officer), and, therefore, has an insufficient basis of

knowledge of the events to render an expert opinion regarding the use of

force; (4) with regard to Dr. Stern's claimed opinion regarding the

appropriateness of the force used, he did not use the accepted approaches

for analyzing the reasonableness and appropriateness of physical force used by officers; (5) Dr. Stern is not knowledgeable about the effects of the taser on the human body; and (6) Dr. Stern cites to no experience, education, or knowledge which would enable him to offer an expert opinion on these topics.  Def. Motion, p. 2-3 (d/e 413); see also Def. Mem. p. 18-19.

Plaintiff characterizes Dr. Stern's opinions differently, asserting that Dr. Stern's testimony will "relate to the failure of the medical staff to act according to the standard of care needed in response to a planned use of force[3] and the physiological effects of the use of force and tasering on the human body, not the appropriateness of the level of force used, including the [t]asering of Mr. Carlock."  Pl. Resp., p. 6 (d/e 444). Plaintiff also asserts that Dr. Stern "merely opined how the use of force itself, including the use of the [t]aser, were contributing factors to the cause of death of Mr. Carlock."  Id. Specifically, Plaintiff asserts:

---

[3] Plaintiff's use of the term "planned use of force" is puzzling because Dr. Stern testified that the use of force on November 16, 2007 was spontaneous and not planned.  See Stern Dep. p. 160.

> At no time during the deposition testimony did Dr. Stern purport to be an expert on the appropriate level of force used or the actual physical or technical properties of the [t]aser. He merely opined how the use of force itself, including the use of the [t]aser, were contributing factors to the cause of death of Mr. Carlock.

Pl. Resp., p. 6. Plaintiff argues that Dr. Stern is qualified to render opinions on the cause of death and the physiological responses of the human body. Plaintiff also identified Dr. Stern's opinions as including opinions on use of force as it relates to medical operation and the appropriate course of action in response to planned uses of force. Defendants did not specifically seek to bar Dr. Stern from testifying to these opinions, so the Court need not address that issue further. Yet, Defendants did seek to bar Dr. Stern from testifying about the appropriateness of the force used. However, Plaintiff has asserted that Dr. Stern does not purport to be an expert on the appropriate level of forced used. Response, p. 6. Therefore, that issue is also moot.

Consequently, this Court will examine (1) Dr. Stern's opinions regarding the use of force (the November 16, 2007 struggle and the

pressure placed on Carlock's abdomen/chest) and (2) Dr. Stern's opinions

regarding the taser.

Federal Rule of Civil Procedure 26(a) requires parties to disclose the

identity of experts and submit a written report prepared and signed by

that expert.  Fed. R. Civ. P. 26(a)(2)(A), (B).  The written report must

contain "a complete statement of all opinions the expert will express and

the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  A party

must supplement the report if the party "learns that in some material

respect the disclosure or response is incomplete, and if the additional or

corrective information has not otherwise been made known to the other

parties during the discovery process or in writing."  Fed. R. Civ. P.

26(e)(2); but see Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 642

(7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient

expert reports by supplementing them with later deposition testimony").

A party who fails to provide the information required by Federal Rule 26

may not use that information "to supply evidence on a motion, at a

hearing, or at trial, unless the failure was substantially justified or is

harmless."  Fed. R. Civ. P. 37(c)(1) (also providing that instead of this

sanction, the court may order the payment of reasonable expenses,

including attorney fees, caused by the failure); see also Ciomber, 527

F.3d at 641 (7th Cir. 2008) (the failure to provide a report containing all

of the opinions of the retained expert results in the exclusion of that

evidence unless the offending party can establish that the violation was

justified or harmless).

In this case, although Dr. Stern's Report uses the phrase "use of

force,"  nothing in Dr. Stern's Report indicated he was specifically

offering an opinion on the taser.  Moreover, when asked during the

deposition about his opinion on factors that contributed to Carlock's

death, Dr. Stern never mentioned the taser.  The only use of force Dr.

Stern identified was the "pressure being applied to Mr. Carlock's chest

and/or abdomen."  Stern Dep. pp. 144-146.  The first mention of a taser

came from questions by Plaintiff's counsel, and Plaintiff's counsel did not

give Defendants' counsel the opportunity to follow-up on that line of

questioning.  Moreover, even during the questioning by Plaintiff's

counsel, Dr. Stern stated he "did not offer an opinion on the effect of the [t]aser because [he was] not sure what the effect would be."   Stern Dep., p. 250.

Dr. Stern's failure to disclose in his Report his opinions regarding the use and the effect of the taser is a sufficient basis to bar Dr. Stern from offering an opinion regarding the taser.  Nonetheless, the Court, in an exercise of its discretion, will grant Plaintiff leave to file a supplemental report so long as Plaintiff makes Dr. Stern available for a supplemental deposition (limited to Dr. Stern's opinions regarding the use and effects of the taser) at Plaintiff's expense.

The Court now turns to the remaining opinions at issue.  Plaintiff asserts that Dr. Stern should be permitted to testify regarding how the use of force (excluding the taser) contributed to Carlock's death and the physiological effects of the use of force (excluding the taser) on the human body.  These opinions were disclosed in the Report.  See Report, p. 2, 25.

Defendants first assert that Dr. Stern is not qualified to testify on

those subjects.  Plaintiff asserts that in addition to Dr. Stern's
qualifications (recited above in the Background section), Dr. Stern's
general internal medicine training included an important component:
evidence-based medicine.  According to Plaintiff, evidence-based
medicine is the "study of how to read and interpret the medical literature
and assure that medical decisions are based on sound, high quality
evidence."  Pl. Resp., p. 8. Plaintiff states that Dr. Stern's experience in
evidence-based medicine is an additional qualification that allows him to
opine on physiology.

       This Court agrees with Plaintiff that Dr. Stern is qualified by
education, training, and experience to give his opinion regarding the
effects of respiratory compromise and physical exertion on Carlock and
how that might have contributed to his death.  See Gayton v. McCoy,
593 F.3d 610, 618 (7th Cir. 2010) (finding that the physician was
qualified to testify that the decedent's vomiting combined with her
medication contributed to her death; "the effects of vomiting on
potassium and electrolyte levels on the body . . . is knowledge that any

competent physician would typically possess"); <u>Carroll</u>, 896 F.2d at 212

(noting that while a medical degree does not qualify a doctor to opine on

all medical subjects, a general practice physician is often competent to

testify about problems treated by a specialist).  "Rule 702 specifically

contemplates the admission of testimony by experts whose knowledge is

based on experience."  <u>Walker</u>, 208 F.3d at 591.

Defendants also challenge the reliability of Dr. Stern's opinion and

his methodology.  As noted above, Dr. Stern disclosed in his Report his

opinions that the cause of death was multi-factorial and included

"respiratory compromise from the use of force superimposed on physical

exertion during the use of force" and that the "severe physiologic

challenges Mr. Carlock encountered during the use of force on 11/16

were magnified" by his poor health.  Report, p. 2, 25.  In his deposition,

Dr. Stern explained that from his reading of the records, he believed

Carlock was not being cooperative and was resisting.  Carlock's act of

resisting, accompanied by the use of force (pressure on Carlock's

abdonmen/chest) restricted Carlock's ability to breathe.  Stern Dep.,  pp.

144-46.  Dr. Stern further explained, in his Declaration attached to the

Response to the Motion, that his references to use of force relied on large

part on the physiologic effects on the human body of extreme exertion.

See Declaration (d/e 444-1).

The Court finds that Dr. Stern's opinion is reliable because it is

based on his experience as a internist and his relevant medical knowledge.

See Heard v. Illinois Dept. of Corrections, 2012 WL 2524748, *3 (N.D.

Ill. 2012) (finding that the expert's "review comports with the accepted

methodology in clinical medicine of reliance on a patient's medical

history and available medical treatments");  In re Yasmin and YAZ

(Drospirenone) Marketing Sales Practices & Products Liability Litigation,

2011 WL 6733952, at *6 (S.D. Ill. 2011) (finding that an opinion was

reliable where it was based on the doctor's experience and relevant

medical knowledge).

Defendants argue that Dr. Stern's methods are not reliable because

he did not review the reports of the participants in the struggle of

November 16, 2007, except for a few pages of one correctional officer.

However, "the factual underpinnings of expert testimony may be subject to counter-attack."  Walker, 208 F.3d at 586, citing Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate way of attacking shaky but admissible evidence"); Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact").

Defendants also argue that Dr. Stern has not pointed to any medical or scientific basis, peer reviewed authority, or studies which support his tendered opinions.  This argument is primarily directed against Dr. Stern's opinions regarding the use and effects of tasers, which this Court has barred without further written disclosure and deposition. In any event, while peer-reviewed authority and studies are a factor to consider when determining whether an expert's theory is reliable, that factor is not dispositive.  Smith v. Ford Motor Co., 215 F.3d 713, 720

(7th Cir. 2000) ("no single factor among the traditional <u>Daubert</u> list is conclusive in determining whether the methodology relied on by a proposed expert is reliable").  Here, the limited opinion testimony by Dr. Stern–the physiological effects of the use of force (excluding the taser) and the extent to which it may have contributed to Carlock's death–is reliable because Dr. Stern is applying medical knowledge gained from his training and experience to a set of facts.

## B.   Dr. Stern's Opinion on Deliberate Indifference

Defendants also assert that Dr. Stern should be barred from rendering an opinion that the actions of Defendants in any manner resulted in "deliberate indifference."  Defendants note that while Dr. Stern can testify to deviations from the standard of care, he cannot opine that the actions of any defendant were deliberately indifferent, which is an ultimate conclusion reserved for the finder of fact.[4]

---

[4] Defendants also state that Dr. Stern is not qualified to give opinions regarding the care by the jail nurses but does not develop this argument or provide citation to any cases.  Because the Court finds that Dr. Stern cannot opine on whether the actions of certain Defendants constituted deliberate indifference, the Court need not address Defendants' additional claim that Dr. Stern is not qualified to give an opinion on deliberate indifference.

Plaintiff responds that deliberate indifference, "as used by Dr. Stern, is not meant to be a legal description of a level of culpability but a layman's term used to further explain the actions of the nurses employed by the jail." Pl. Resp., p. 16. The Court agrees with Defendants.

In his Report and deposition, Dr. Stern offers the opinion that nurses employed by the jail were deliberately indifferent. <u>See</u> Report, p. 22, Stern Dep., pp. 176-186. "[T]estimony offering nothing more than a legal conclusion–i.e. testimony that does little more than tell the jury what result to reach–is properly excludable" under the Federal Rules of Evidence. <u>Woods v. Lecureux</u>, 110 F. 3d 1215, 1220 (6th Cir. 1997). Opinion testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury." <u>Id.</u> at 1221.

One of the issues in this case is whether certain Defendants were deliberately indifferent to Carlock's medical needs. The Court will instruct the jury on deliberate indifference. <u>See</u> Federal Civil Jury

Instructions of the Seventh Circuit, § 7.14 (defining deliberate indifference); see also Sommerfield v. City of Chicago, 254 F.R.D. 317, 334 (N.D. Ill. 2008) (barring an expert from testifying that the Chicago Police Department was deliberately indifferent because it was a legal conclusion, was inadmissible, and the jury would be instructed on what constituted deliberate indifference).  Allowing Dr. Stern to testify that certain Defendants were deliberately indifferent would not be helpful to the jury and would tend to confuse the jury.  Therefore, this Court bars Dr. Stern from offering the opinion that certain Defendants were deliberately indifferent.  See Estate of Gee v. Bloomington Hosp., 2012 WL 591459, at *2 (S.D. Ind. 2012) (barring the plaintiff's expert from testifying that the defendants acted with deliberate indifference).

## IV.  CONCLUSION

For the reasons stated, the Motion to Exclude Certain Testimony and Report of Dr. Marc Stern (d/e 413) is GRANTED IN PART and DENIED IN PART.  The Motion is DENIED regarding Dr. Stern's opinions on use of force (other than the taser) as described in this

Opinion.  The Motion is GRANTED regarding Dr. Stern's opinion that certain conduct constituted deliberate indifference and Dr. Stern's opinions on the use and effects of the taser.  Plaintiff is GRANTED LEAVE to file a supplemental report by Dr. Stern and make Dr. Stern available for a supplemental deposition (limited to Dr. Stern's opinions regarding the use and effects of the taser) at Plaintiff's expense.  If Plaintiff does file a supplemental report and make Dr. Stern available for deposition at Plaintiff's expense, Defendants may thereafter file a second motion to bar and exclude Dr. Stern's testimony on the use and effects of the taser.

ENTER: August 29, 2012

FOR THE COURT:

<u>                s/Sue E. Myerscough        </u>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE