# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ESTATE OF AMON PAUL CARLOCK, JR., Deceased, by Mary L. Andreatta-Carlock, Executor, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  08-3075 |
| NEIL WILLIAMSON, AS SHERIFF OF SANGAMON COUNTY; ANTHONY SACCO, CHIEF DEPUTY; TERRY DURR, JAIL SUPERINTENDENT; WILLIAM STRAYER, ASSISTANT JAIL SUPERINTENDENT; LT. RON BECKNER, ADMINISTRATOR OF SANGAMON COUNTY JAIL; LT. CANDACE CAIN; LT. TAMMY POWELL; SGT. TODD GUY; CO KEVIN FURLONG; NURSE LEE ANNE BRAUER, R.N.; NURSE NIECEY WEST, L.P.N.; NURSE LUCY RAMSEY, L.P.N.; JOSEPH MAURER, M.D.; CHAUNCEY C. MAHER, III, M.D. and SANGAMON COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge.

This cause is before the Court on the Joint Motion to Exclude

Certain Testimony and Reports of Dr. James Hubler (d/e 418) filed by

Defendants Neil Williamson, Anthony Sacco, Terry Durr, William

Strayer, Ron Beckner, Candace Cain, Tammy Powell, Kevin Furlong, Lee

Anne Brauer, Niecey West, Lucy Ramsey, and Todd Guy.  For the

reasons that follow, the Motion is DENIED.

## I.  BACKGROUND

In this lawsuit, Plaintiff, the Estate of Amon Paul Carlock, Jr.,

deceased, by Mary L. Andreatta-Carlock, Executor, alleges that Carlock

was a pretrial detainee housed at the Sangamon County Illinois jail from

October 9, 2007, until his death on November 16, 2007.  See Fourth

Amended Complaint (d/e 138).  The Fourth Amended Complaint

contains § 1983 claims for excessive force and deliberate indifference to

Carlock's medical needs, as well as several state law claims.  The

allegations in the Fourth Amended Complaint include the following: that

on November 16, 2007, Carlock was placed face down, with his hands

handcuffed behind his back and his legs shackled;  Defendant Furlong

held Carlock at the back of Carlock's neck and placed a portion of his

285 pounds on Carlock's back both before and after Carlock was tasered;
Carlock became unresponsive; and no jail personnel provided medical
care or lifesaving measures.  See ¶¶ 33, 61, 80.

The defendants in this case include the County Defendants–Neil
Williamson, Anthony Sacco, Terry Durr, William Strayer, Ron Beckner,
Candace Cain, Tammy Powell, Kevin Furlong, Lee Anne Brauer, Niecey
West, Lucy Ramsey, and Todd Guy–as well as the medical
Defendants–Joseph Maurer, M.D. and Chauncey C. Maher, III, M.D.
The Motion to Exclude Certain Testimony and Report of Dr. James
Hubler was filed by the County Defendants.

A.    Summary of Dr. Hubler's Curriculum Vitae

According to Dr. Hubler's Curriculum Vitae (d/e 419-1), he is
currently the Attending Physician in the Department of Emergency
Medicine at OSF Saint Francis Hospital, a Level I Trauma Center.  He is
also a Clinical Assistant Professor of Surgery for the University of Illinois
College of Medicine at Peoria.  Dr. Hubler is certified by the American
Board of Emergency Medicine.  He is also a certified Advanced Cardiac

Life Support Instructor and a certified Basic Traumatic Life Support
Instructor.

B.    Summary of Dr. Hubler's Two Reports

In May 2009, Dr. Hubler prepared a Report (d/e 419-1 ) (May
Report).  The May 2009 Report indicates Dr. Hubler reviewed the
medical records, autopsy reports, and depositions of Nurse West, Nurse
Ramsey, Nurse Brauer, Dr. Maurer, Dr. Maher, and Amy Jeffers of
Paramedic American Ambulance.  In the May 2009 Report, Dr. Hubler
gives his opinion that there was a "reasonable and meritorious cause for
filing" the lawsuit against Dr. Maurer and Dr. Maher and gives the basis
for that opinion.

In June 2009, Dr. Hubler prepared a second Report (d/e 419-1)
(June Report) also containing his opinion that there was a "reasonable
and meritorious cause for filing" the lawsuit against Dr. Maurer and Dr.
Maher.  The June Report indicates that Dr. Hubler reviewed, in addition
to the documents identified in the first report, a cover letter from
attorney Kelley with a summary of events and Plaintiff's Third Amended

Complaint.  As is relevant to the issues herein, the June 2009 Report also

contained the following:

> [Dr. Maher's] failure to follow up on the
> laboratory testing and to order laboratory testing
> sooner was a breach in the standard of care and
> ultimately caused Mr. Carlock's death.  Mr.
> Carlock's altered mental status was a direct result
> of his abnormal lab values.  The altered mental
> state lead [sic] to a scuffle with jail officers, which
> resulted in his positional asphyxia.  It is my
> opinion to a reasonable degree of medical certainty
> that Dr. Maurer failed to meet the standard of
> care and caused injury and death to Mr. Carlock,
> which could have been prevented.

June Report (d/e 419-1).  Dr. Hubler expressed a similar opinion with

regard to Dr. Maher.  Id.

C.    Summary of Dr. Hubler's Deposition Testimony

    Dr. Hubler's deposition took place on March 7, 2011.  See

Deposition Transcript (d/e 419-2).  At the deposition, Dr. Hubler

testified that at the time in question, Carlock was suffering from severe

dehydration, renal failure, lithium toxicity, depressive bipolar disorder,

and diabetes.  Dep., p. 12.  According to Dr. Hubler, but for the pressure

on the chest, the dehydration, renal failure, lithium toxicity,

abnormalities, and electrolytes could have been corrected and Carlock

could have survived.  Dep., p. 14.  Dr. Hubler also testified:

> Both the dehydration and the hyperkalemia
> potassium were treatable conditions.
> Unfortunately, being so critically ill, it left him in
> a very brittle state more likely to suffer
> arrhythmias and positional asphyxia.
>
> People who are generally healthy, you or I
> positioned in a hobble position would not have
> positional asphyxia.  Those people are
> generally–have multiple medical conditions or
> psychiatric conditions.  Those patients are more
> likely, very much more likely, to have positional
> asphyxia or excited delirium.[1]

Dep., p. 13-14.

When asked what, in his opinion, caused Carlock's death, Dr.

Hubler testified:

> Mr. Carlock was in a brittle medical condition.  He
> was dehydrated, hyperglycemic[,] and showed
> signs of hyperkalemia and acidosis.  When
> someone is in such a brittle medical condition,

---

[1] Dr. Hubler described excited delirium as when a psychiatric, violent, or drug-overdose patient continues to struggle against force and has a sudden cardiac arrest. Dep. p. 96.  While Dr. Hubler thought Carlock could have suffered excited delirium, he thought it more likely that it was the positional asphyxia accompanied by Carlock's medical condition that led to an arrhythmia.  Dep. p. 96.

> they're placed in a hobble position or a position
> which may be called positional asphyxia.  With a
> large man on their back, they are more likely to
> have a respiratory or cardiac arrest.
>
> He died as a result of the combination of physical
> forces applied to his body while being face down in
> a hobble position and his underlying medical
> condition, which was those things I just stated.

Dep. p. 26.  Dr. Hubler, later in the deposition, defined "brittle" as

meaning Carlock was "more likely to have arrhythmias and difficulties

due to his electrolyte abnormalities and renal failure."  Dep., p. 111.

Dr. Hubler testified he was not there to render any opinion as to

the appropriateness of the use of a taser.  Dep., p. 86, 94.  However,

when defense counsel asked Dr. Hubler whether he was rendering any

opinion regarding the appropriateness of the use or level of force used in

restraining Carlock, Dr. Hubler stated he was offering such an opinion.

Dep., p. 86.  When asked about his training to render such an opinion,

Dr. Hubler testified:

> The American College of Emergency Physicians is
> frequently challenged with restraint of dangerous
> hostile, demented, delusional patients, and so our
> college has policies on the safe ways to restrain

and it's part of my education and training.

Also, I was the EMS medical director for the
largest pre-hospital system in the State of Illinois
with 72 agencies and two thousand paramedics
and developed protocols on safe restraint of
patients.

I sat on the Tazewell County Restraint Task Force.
They had an adverse outcome in the jail and I was
the medical representative on how to–how they
should safely restrain patients in the jail.

Dep. p. 86-87. Dr. Hubler admitted he had no expertise or training in

the specific area of use of force and control in a correctional facility.

Dep. p. 88. Dr. Hubler testified that on occasion, emergency staff are

presented with people that need to be restrained. Dep. p. 111-12.

Dr. Hubler admitted his Reports did not include his opinions on

the appropriateness or level of force used in this case. Dep. p. 88. When

asked if he planned to render an opinion with respect to the

appropriateness of the use of or the level of force used in this case, Dr.

Hubler testified, "If asked, yes." Dep., p. 88. Dr. Hubler testified that

his opinion would be that:

patients should not be restrained in a hobble

> position.  It predisposes agitated patients to
> positional and excited delirium and cardiac
> arrhythmias and respiratory arrest.
>
> Furthermore, when restraining patients, you do
> need to use a show of force.  You do need to go in
> and put the patient down and the patient – excuse
> me, the correctional officers, the paramedics, the
> people involved in the restraint, their safety is of
> paramount importance, there's no doubt about it.
> But once they are restrained, they need to be
> rolled into a safe position.

Dep., pp. 88-89.  Dr. Hubler defined the "hobble position" as being

when patients are placed down, their chest and legs are brought up

behind them, and their hands are restrained behind their back.  Dep., p.

111.

When asked what was inappropriate about the use or level of force

in this case, Dr. Hubler testified:

> Well, one, the hobble position is considered
> dangerous.  Our college and many law
> enforcement agencies have declared the hobble
> position to be not standard of care, not to be used.
> * * *
> The other issue is the fact that when you have a
> large 285-pound individual sitting on someone's
> back, they're more likely to have positional
> asphyxia.

Dep., p. 89.  When asked his authority for that opinion, Dr. Hubler

testified, "I just went over those with you."  Dep., p. 89.

Defense counsel asked Dr. Hubler about his failure to look at the

statements of the people involved in the struggle before rendering an

opinion on the appropriateness and extent of the use of force.  See Dep.,

pp. 91-93.  Dr. Hubler agreed that reviewing such information would be

helpful.  Dep. p. 93.  Dr. Hubler also testified, in support of his reliance

on the documents he reviewed:

> I mean, reviewing the fact that he was agitated,
> taken to the ground, kicked one of the officers in
> the groin, was held on the legs with two guys
> standing on his legs and a 285-pound guy on his
> back in a hobble position, that's pretty evidentiary
> to me that he was restrained in a position that was
> unsafe and made him more likely to have
> positional asphyxia.

Dep., pp. 91-92.

Dr. Hubler explained how positional asphyxia results in death:

> One, you can't expand the chest well.  And, two,
> you have decreased venous return to the heart, so
> you can't pump effectively, you can't breathe
> effectively. * * * And then you have a cardiac
> arrest and you die.

Page 10 of  28

Dep. p. 100.  Dr. Hubler testified he believed that positional asphyxia had occurred in Carlock's case.  Dep., pp. 99-100.  However, Dr. Hubler agreed there was no anatomical finding postmortem that confirms positional asphyxia.  Dep., p. 100-01.

Dr. Hubler testified that he was not qualified in the field of corrections.  Dep. p. 94.  He has not written any articles that are relevant to his opinions in this case nor has he testified in a case that has the same issues as this case.  Dep. p. 46

During the deposition, defense counsel asked Dr. Hubler about a Report he wrote to Plaintiff's counsel dated June 3, 2009.  Dep., p. 57-58 (Insurance Report).  In the Insurance Report, Dr. Hubler concludes that Carlock's death was accidental.  See Insurance Report (d/e 419-3). Specifically, Dr. Hubler states that "Carlock experienced a sudden and unforseen physical event that [led] to compressive or positional asphyxia which caused his death."  June 2009 Report (d/e 419-3).  Dr. Hubler explained that the Insurance Report was written following his review of a claims adjuster's summary stating that, under the insurance policy, the

accidental death provision did not apply.  Dep. pp. 57-58.

When asked whether that was still his opinion, Dr. Hubler testified:

> Yes, it is.  I can explain.  The hobble position,
> positional asphyxia, had a patient restrained who
> is more likely to have those type of asphyxias
> because of their brittle medical condition.  So the
> brittle–obviously, that being hobbled face down,
> made him more susceptible to cardiac arrest.

Dep., p. 59.  Dr. Hubler further explained that the Insurance Report was

meant to convince the insurance company that the death was accidental.

Dep. p. 103.  Dr. Hubler testified he did not assume that the guards

meant to kill Carlock.  Dep., p. 102.

Plaintiff's counsel conducted the following examination of Dr.

Hubler:

> Q.  You were asked about, by one of the attorneys,
> whether, and I think it was in connection with the
> concept of excited delirium, that people struggle
> often in that condition.  But isn't it true that
> people who are placed in a position where they
> cannot breathe, and especially if they've got heavy
> weight on their back, face down, would you expect
> that a normal human being would struggle with
> whatever he or she had left to try to breathe?
>
> A.  They would continue to try to breathe, right.

And patients who are placed face down who don't have underlying medical conditions that are hobbled don't have the same asphyxia that patients with medical problems do.  Nobody knows why.

Q.  So is it your opinion then that because of all these medical conditions, renal failure, lithium toxicity, uncontrolled diabetes, that that made him much more likely to die from asphyxia in the jail?

A.  Yes.

Dep., pp. 129-130.

Defendants now move to bar and exclude portions of Dr. Hubler's testimony and opinions.

## II.  LEGAL STANDARD

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in <u>Daubert [v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993).]"  <u>Bielskis v. Louisville Ladder, Inc.</u>, 663 F.3d 887, 893 (7th Cir. 2011).  To determine whether to admit expert testimony, this Court must examine whether (1) "the witness is qualified,"(2) "the expert's methodology is scientifically reliable," and (3) "the testimony 'will assist the trier of fact to understand the evidence or

to determine a fact in issue.'" <u>Myers v. Illinois Central R.R. Co.</u>, 629 F.3d 639, 644 (7th Cir. 2010) (quoting <u>Ervin v. Johnson & Johnson, Inc.</u>, 492 F.3d 901, 904 (7th Cir. 2007)).  The test is a flexible one. <u>Bielskis</u>, 663 F.3d at 894 (the district court performs a gatekeeping function when determining whether to exclude expert testimony).  The party that proffers an expert's testimony must establish the admissibility of the testimony by a preponderance of evidence.  <u>Lewis v. CITGO Petroleum Corp.</u>, 561 F.3d 698, 705 (7th Cir. 2009).

To determine whether a witness is qualified as an expert, the court must compare the area in which the witness has "superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." <u>Carroll v. Otis Elevator Co.</u>, 896 F.2d 210, 212 (7th Cir. 1990).  "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." <u>Walker v. Soo Line R.R. Co.</u>, 208 F.3d 581, 591 (7th Cir. 2000).

To aid courts in assessing the reliability of scientific expert testimony, the Supreme Court, in <u>Daubert</u>, set forth a non-exhaustive list

of "guideposts" for consideration: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community.  Daubert, 509 U.S. at 593-94; see also Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002).  In addition to these factors, the 2000 Advisory Committee's Notes to Federal Rule of Evidence 702 suggest that a court also consider (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"; (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10)

"[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."  Fed. R. Evid. 702 advisory committee's note (2000 amends.) (internal quotation marks omitted).  Because the <u>Daubert</u> inquiry is a flexible one, an expert's testimony need not satisfy each of the above factors to be admissible.  <u>Chapman</u>, 297 F.3d at 687; <u>see also</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 150 (1999) (""In other cases, the relevant reliability concerns may focus upon personal knowledge or experience").

## III.  ANALYSIS

In their Motion, Defendants assert that Dr. Hubler's opinions regarding restraint/positional asphyxia, use of force, and the appropriate use and effects of the taser should be stricken.  Defendants also argue Dr. Hubler's opinion should be excluded because he has demonstrated "a willingness to abandon the norms of his profession in the interest of his client" as evidenced by the Insurance Report.  Def. Mot., p. 15.

A.    <u>Plaintiff Concedes that Dr. Hubler is Not Offering an Opinion on the Appropriateness of the Use of the Taser and its Effects on the Human Body</u>

Defendants seek to bar Dr. Hubler from testifying as to the appropriateness of the use of the taser and its effects on the human body. Plaintiff responds that "at no point were there any claims made by Dr. Hubler that he was an expert in the use of [t]asers or that he had an opinion on the use of the [t]aser."  Plaintiff further states that "Plaintiff has never expressed any desire to elicit an opinion about the use of the [t]aser from Dr. Hubler during the deposition or at trial."  Pl. Mem. p. 5. Therefore, because Dr. Hubler will not be offering an opinion regarding the appropriateness of the use of the taser or its effects on the human body, the potion of the Motion seeking to bar such testimony is DENIED AS MOOT.


B.    <u>The Positional Asphyxia Opinion Was Contained in the June 2009 Report, and the Court Will Not Bar Dr. Hubler's Use of Force Opinion For Plaintiff's Failure to Disclose or Supplement the Reports</u>

Defendants argue that Dr. Hubler's opinions on restraint/positional asphyxia and use of force are properly excluded for the failure to comply with Rule 26.  Specifically, Defendants assert that Dr. Hubler rendered

opinions concerning use of force and restraint techniques for the first

time at his deposition which were not contained in his Reports.

Defendants claim that Plaintiff should have supplemented the Reports,

and, having failed to do so, the opinions not included in the Reports

should be barred.

Plaintiff responds that Dr. Hubler's report did include a diagnosis

of positional asphyxia and that this was sufficient to comply with Rule

26.  Plaintiff admits that, while Dr. Hubler's reports did not specifically

disclose his opinions on use of force, the testimony is within Dr. Hubler's

area of expertise and should not be excluded.  In particular, Plaintiff

notes that Dr. Hubler's testimony about the use of force was not

anticipated by Plaintiff but was "dragged out of [Dr. Hubler] by counsel

for the Defendants."  Pl. Mem. p. 7.

Rule 26(a)(2)(B)(i) requires an expert to include in his report "a

complete statement of all opinions the witness will express and the basis

and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  The party

tendering the expert has a duty to supplement the report if the party

learns that the information is incomplete or incorrect. Fed. R. Civ. P. 26(e).

If a party fails to disclose information required by Rule 26(a) or fails to supplement the information provided, the party may not use the "information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c).  Whether a failure was substantially justified or harmless is a determination that is within the discretion of the court.  David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003); see also Fed. R. Civ. P. 37(c) (identifying sanctions other than barring a witness).  The relevant factors to consider when determining whether a failure was substantially justified or harmless include: (1) the prejudice and surprise to the opposing party; (2) the ability of the party to cure any prejudice; (3) the likelihood of disruption of the trial; and (4) the bad faith or wilfulness involved in not disclosing the evidence sooner.  Id.

Here, Dr. Hubler's Reports did disclose his opinion on positional asphyxia.  Moreover, while Dr. Hubler's Reports do not disclose his

opinions on use of force, the failure is substantially justified and harmless. In particular, Plaintiff asserts that she had not asked Dr. Hubler for that opinion (defense counsel elicited it at the deposition) and did not anticipate that Dr. Hubler would give such an opinion. However, once Dr. Hubler gave his opinion, Plaintiff should have had Dr. Hubler supplement the Reports.

Nonetheless, Defendants were not surprised by the testimony and any prejudice has been cured by Defendants' opportunity to fully examine Dr. Hubler during the deposition. The trial has not been disrupted as a date for trial has not been set. Finally, Plaintiff did not act in bad faith or willfully in not disclosing the evidence sooner. Therefore, this Court concludes, in its discretion, that the failure to supplement was substantially justified and harmless.

This Court notes that in <u>Ciomber v. Cooperative Plus, Inc.</u>, 527 F.3d 635, 642 (7th Cir. 2008), the Seventh Circuit held that "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." In so finding, the

Seventh Circuit noted that the purpose of Rule 26(a)(2) was to provide notice to opposing counsel "as to what the expert witness will testify."
<u>Id.</u>

In this case, however, Defendants had sufficient information to prepare for Dr. Hubler's deposition, as evidenced by the deposition transcript.  <u>See</u>, <u>e.g.</u>, <u>Matavante Corp. v. Emigrant Sav. Bank</u>, 619 F.3d 748, 762 (7th Cir. 2010) (distinguishing <u>Ciomber</u> on the basis that the expert's reports gave the defendant sufficient information to prepare for the expert's testimony, as evidenced by the cross-examination of the expert).  Therefore, Dr. Hubler's opinion will not be barred on the ground that Plaintiff failed to disclose or supplement Dr. Hubler's Reports.

C.     <u>Dr. Hubler May Testify Regarding His Opinions on Restraint/Positional Asphyxia and Use of Force</u>

Defendants argue that Dr. Hubler's opinions on restraint/asphyxia should be barred because he (1) has no personal experience or expertise in the specific area of use of force in a correctional setting; (2) has never been qualified as an expert or allowed to render an opinion on the

appropriateness or extent of the use of force; (3) expressed his opinion

regarding positional asphyxia based on the incorrect assumption that

Carlock had been placed in a hobble position; and (4) did not review all

the relevant documents concerning the event.  However, each of these

criticisms go more to the weight of Dr. Hubler's testimony as opposed to

its reliability and can be adequately addressed by defense counsel on

cross-examination.  See Daubert, 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence, and careful instruction

on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence"); see also Smith v. Ford Motor

Co., 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual

underpinnings of the expert's analysis and the correctness of the expert's

conclusions based on that analysis are factual matters to be determined

by the trier of fact"); Heard v. Illinois Dep't of Corrections, 2012 WL

2524748, at *5 (N.D. Ill. 2012) ("[N]either Daubert nor the Federal

Rules of Evidence requires an expert to review all of the facts, only a

'sufficient' amount is required").

Defendants also argue that Dr. Hubler is not qualified to give an opinion on use of force and restraint/asphyxia.  However, Dr. Hubler is Board Certified in Emergency Medicine.  <u>See</u> Curriculum Vitae (d/e 419-1).  He testified that the American College of Emergency Physicians is frequently challenged with restraint of dangerous patients.  Dep., p. 86-87.  According to Dr. Hubler, his college has policies on the safe way to restrain such patients, which is part of Dr. Hubler's training and education.  Dep., p. 87.  Dr. Hubler also developed protocols on the safe restraint of patients as the EMS Medical Director.  Dep., p. 87.  In addition, Dr. Hubler sat on the Tazewell County Restraint Task Force as the medical representative on how to safely restrain patients in jail.  Dep., p. 87.  Accordingly, Dr. Hubler is qualified on the basis of training and education to give the opinions he expressed regarding restraint/positional asphyxia and use of force.  <u>See</u>, <u>e.g.</u> <u>Walker</u>, 208 F.3d at 591 (finding that the expert "demonstrated professional experience in the area of electrical safety, and Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on

experience").

Defendants next challenge Dr. Hubler's methodology.  Defendants contend that Dr. Hubler provided no explanation for how he arrived at his stated conclusions regarding the use of force or positional asphyxia. According to Defendants, Dr. Hubler's opinions are not grounded in the scientific process and are based on speculation.

Dr. Hubler testified that positional asphyxia causes death because the person cannot expand the chest and has decreased venous return to the heart.  Dep., p. 100.  Dr. Hubler was also critical of Carlock having been left in a face down position.  Dep., p. 89.  Further, Dr. Hubler testified that, once a patient is restrained, he needs to be rolled into a safe position.  Dep., p. 89.  Dr. Hubler explained that a person with a brittle medical condition, like Carlock, is more susceptible to cardiac arrest if restrained in a hobble position.  Dep., p. 26; see also Dep. p. 59 (agreeing that his opinion was that "Carlock's medical condition made him more likely to die during the struggle with police officers").

Dr. Hubler's methodology for the above opinions, which is based

on his education and training, is sufficiently reliable under the flexible

discretion afforded to courts under <u>Daubert</u> and Rule 702.  <u>See</u>

<u>Baldonado v. Wyeth</u>, 2012 WL 3234240, at *3-6 (N.D. Ill. 2012)

(finding the expert's methodology reliable where it was based on her

training and experience); <u>Matavante Corp.</u>, 619 F.3d at 761 ("An

expert's testimony is not unreliable simply because it is founded on his

experience rather than on data").

Finally, although Defendants do not challenge the relevance of Dr.

Hubler's opinions, the Court finds Dr. Hubler's opinions sufficiently

relevant.  Dr. Hubler's testimony will assist the jury with understanding

the evidence or determining a fact at issue in the case.  <u>See</u> Fed. R. Evid.

702 (providing that the expert's knowledge must "help the trier of fact to

understand the evidence or to determine a fact in issue").  Moreover, the

testimony "fits" the issues about which Dr. Hubler is testifying.  <u>See</u>

<u>Chapman</u>, 297 F.3d at 687 (noting that the district court must determine

whether the testimony "'fit[s]' the issue to which the expert is testifying"

(quoting <u>Porter v. Whitehall Labs., Inc.</u>, 9 F.3d 607, 614 (7th Cir.

1993))).  That is, Dr. Hubler's opinions on the use of force, restraint, and positional asphyxia and how each may have contributed to Carlock's death is connected to the issues in the case (including the proximate cause of Carlock's death and whether the force used was objectively reasonable) and will aid the jury in determining those issues.

D.    The Insurance Report Does Not Demonstrate that Dr. Hubler Has Shown a Willingness to Abandon the Norms of His Profession in the Interest of His Client

Defendants last argue that "a tendered expert witness opinion can be excluded if the witness demonstrates a willingness to abandon the norms of his profession in the interest of his client."  Def. Mem. p. 15.

An opinion may be excluded if the expert has shown a willingness to abandon the norms of his profession in the interest of his client.  In Emerald Invs. Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co., 516 F.3d 612, 617-18 (7th Cir. 2008), the Seventh Circuit found the district court did not err by summarily excluding a finance professor's second report, noting:

> Buser's first report was so irresponsible as to
> justify the judge's decision to exclude the second

> report summarily.  Buser had demonstrated a
> willingness to abandon the norms of his profession
> in the interest of his client.  Such a person cannot
> be trusted to continue as an expert witness in a
> case in which he has demonstrated that
> willingness, and perhaps not in other cases either.

Emerald Invs., 516 F.3d at 617-18.

The instant case, however, is distinguishable.  Dr. Hubler's

Insurance Report is not inconsistent with his earlier reports and does not

demonstrate a "willingness to abandon the norms of his profession in the

interest of his client."  Therefore, Dr. Hubler's opinions are not barred on

this basis either.

## IV. CONCLUSION

For the reasons stated, the Joint Motion to Exclude Certain

Testimony and Reports of Dr. James Hubler (d/e 418) filed by the

Defendants Neil Williamson, Anthony Sacco, Terry Durr, William

Strayer, Ron Beckner, Candace Cain, Tammy Powell, Kevin Furlong, Lee

Anne Brauer, Niecey West, Lucy Ramsey, and Todd Guy is DENIED.

However, as required by Federal Rule of Civil Procedure 26(e)(2),

Plaintiff is DIRECTED to file a supplemental report by Dr. Hubler on or

before November 26, 2012.

 ENTER: November 1, 2012

FOR THE COURT:

                              <u>          s/Sue E. Myerscough          </u>
                                      SUE E. MYERSCOUGH
                              UNITED STATES DISTRICT JUDGE